IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                    No. CR 10-0769 JB

ROBERTO JAVIER HERNANDEZ-LOPEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed April 28, 2010 (Doc. 21)("Motion").  The Court held an evidentiary hearing on August 13, 2010.  The primary issues are: (i) whether United States Border Patrol Agent Rodolfo Gutierrez, Jr. had reasonable suspicion to stop the Dodge sedan in which Defendant Roberto Javier Hernandez-Lopez was a passenger; and (ii) whether Gutierrez was justified in detaining Hernandez-Lopez.  The Court grants Hernandez-Lopez' Motion, because it finds Gutierrez did not have reasonable suspicion to stop the Dodge sedan in which Hernandez-Lopez was a passenger.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge

to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.    Border Patrol agents have jurisdiction to enforce the Immigration and Nationality Act of 1952, codified in Title 8 of the United States Code, and the Controlled Substances Act, codified in sections of Title 21.  See 8 U.S.C. § 1357; 8 CFR § 287.8 (c)(2)(i); Transcript of Hearing at 55:13-56:2 (taken August 13, 2010)(Cairns, Gutierrez)("Tr."); id. at 118:7-11 (Pori, Gutierrez); id. at 127:19-128:6 (Cairns, Mechem).[1]

2.    Some motorists are aware that Border Patrol agents do not issue citations for speeding or other traffic violations.  See Tr. at 61:14-25 (Gutierrez); id. at 101:11-13 (Pori, Gutierrez).[2]

3.    Vehicles traveling east Interstate 10 from California and Arizona may not encounter a Border Patrol checkpoint until reaching the checkpoints at Deming, Las Cruces, Hatch, or Truth or Consequences, New Mexico.  See id. 139:5-142:13 (Cairns, Mechem).

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[2] Gutierrez testified that drivers speeding past his location "usually" do not slow down.  Tr. at 61:22-23 (Gutierrez).  Based on this testimony, the United States argues that "the vast majority" of drivers know that the Border Patrol does not have jurisdiction to enforce the New Mexico traffic code.  Id. at 180:15-25 (Cairns).  The Court does not interpret "usually" to mean the "vast majority," and to the extent that Gutierrez testified that a majority of drivers know the Border Patrol's jurisdiction, the Court does not credit that testimony.  The Court finds it more credible that many drivers do not distinguish between different types of law enforcement officers.

4.      Interstate 25 is a major artery for traffic bound from Juarez, Mexico to parts north in the United States.  See U.S. Department of Homeland Security Form, Event No. TCN1002000006 at 2 (dated February 13, 2010), filed April 28, 2010 (Doc. 21-1)("Gutierrez' Report").

5.      I-25 is a corridor for smugglers of contraband, illegal aliens, smugglers of illegal aliens, and the law-abiding, motoring public.  See Gutierrez' Report at 2; Tr. at 57:10-12 (Gutierrez).

6.      The vast majority of people traveling on I-25 are United States citizens who are, at the time of their travels, law abiding.  See Response at 6 (conceding this fact); Motion at 9-10; Gutierrez' Report at 2; Tr. at 57:10-12 (Gutierrez).

7.      Gutierrez has been a Border Patrol Agent for three years and has participated in arrests involving illegal aliens, including approximately twenty arrests on I-25.  See Tr. at 57:22-58:6 (Cairns, Gutierrez); id. at 93:11-14 (Pori, Gutierrez).

8.      On February 13, 2010, Gutierrez was on roving patrol in his marked Border Patrol vehicle monitoring traffic in the north bound lane of I-25 near Truth or Consequences.  See Gutierrez' Report at 2; Tr. at 56:3-22 (Cairns, Gutierrez); id. at 61:12 (Gutierrez).

9.      The area which Gutierrez was patrolling was within 100 air-miles of the international border with Mexico.  See Tr. at 186:18-23 (Cairns, Mechem).

10.     Gutierrez was parked on a berm observing traffic beside I-25 at approximately mile marker 67.  See Gutierrez' Report at 2; Tr. at 59:17-19 (Cairns, Gutierrez); id. at 60:17-22 (Cairns, Gutierrez).

11.     The berm is concealed from approaching traffic.  See Tr. at 128:23-129:19 (Cairns, Mechem)

12.     Drivers were unable to see the Border Patrol unit "until the last minute [when a driver

would] see the Border Patrol agent sitting there when [the driver] c[a]me around the corner." Id. at 129:3-4 (Mechem).

13.     Gutierrez had been on patrol for approximately two hours and had observed hundreds of cars pass by when, at approximately 12:15 p.m., he noticed a Dodge four-door sedan, bearing a New Mexico license plate, pass his location.  See Gutierrez' Report at 2; Tr. at 59:17-19 (Cairns, Gutierrez); id. at 60:17-22 (Cairns, Gutierrez); id. at 81:13-82:5 (Pori, Gutierrez).

14.     The Dodge sedan was not heavily loaded.  See Tr. at 106:1-3 (Pori, Gutierrez).

15.     "A Dodge sedan is not the type of vehicle frequently used by smugglers because of its size, [and] the size of its gas tank . . . ."  Response at 8.  Accord Motion at 10; Tr. at 196:6-11 (Cairns).

16.     As the Dodge sedan passed his location, Gutierrez observed the occupants for a few seconds with his naked eyes.  See Tr. at 89:17-90:1 (Pori, Gutierrez).

17.     The two occupants seated in the front seat looked straight ahead and sat upright as they passed Gutierrez.  See Gutierrez' Report at 2; Tr. at 60:22-61:2 (Cairns, Gutierrez); id. at 62:6-13 (Cairns, Gutierrez).

18.     Gutierrez found this behavior suspicious, because most motorists would usually acknowledge his presence, and some would wave at him as they passed.  See Gutierrez' Report at 2; Tr. at 61:9-17 (Cairns, Gutierrez)("I was in marked Border Patrol unit and usually as people pass my location usually acknowledge my presence.  Some wave at me some don't . . . ."); id. at 82:6-8 (Pori, Gutierrez); id. at 84:15-22 (Pori, Gutierrez).

19.     Gutierrez also found this behavior suspicious, because most motorists usually have a relaxed posture or a bit of a slouch.  See Tr. at 87:22-19 (Pori, Gutierrez).

20.     Gutierrez did not stop all of the vehicles of people who do not wave at him.  See id. at 84:23-24 (Pori, Gutierrez).

21.     Gutierrez did not stop the Dodge sedan because the occupants failed wave at him. See id. at 85:7 (Gutierrez)("I did not perform the stop for that reason.").

22.     Gutierrez left his observation position to follow the Dodge sedan on I-25.  See id. at 63:5-9 (Cairns, Gutierrez).

23.     As Gutierrez "got closer to the vehicle" in the same lane, but more than two car lengths behind the Dodge sedan, the Dodge sedan wavered on the road, swerving between the lanes and crossing over the fog line.  Tr. at 63:10-17 (Cairns, Gutierrez).  See Gutierrez' Report at 2; Tr. at 104:5-11 (Pori, Gutierrez); id. at 131:24-132:5 (Cairns, Mechem).

24.     When Gutierrez first caught up with the Dodge sedan, the Dodge sedan was in the right lane, and Gutierrez was in the left passing lane.  See Tr. at 97:13-99:21 (Pori, Gutierrez).

25.     Gutierrez came within a car length of the Dodge sedan, at which time the Dodge sedan reduced its speed as though the driver wished the Border Patrol agent to pass.  See Gutierrez' Report at 2; Tr. at 65:20-25 (Cairns, Gutierrez); id. at 97:13-99:21 (Pori, Gutierrez).

26.     Gutierrez did not pass the Dodge sedan, but decelerated in the fast lane until the Dodge sedan was sufficiently far in front of him that Gutierrez was able to pull behind it, and then he changed lanes to fall in behind the Dodge sedan in the slow lane.  See Tr. 99:6-23 (Pori, Gutierrez).[3]

------

[3] The factual circumstances surrounding the stop are in dispute.  Gutierrez contends that, as he pulled up behind the Dodge sedan, the driver of the Dodge sedan reduced his speed as if he wanted Agent Gutierrez to pass him.  Hernandez-Lopez contends that Gutierrez pulled in front of the Dodge sedan and dramatically reduced his speed, as if to encourage the driver to slow to a stop. See Motion at 3 n.1. Because Hernandez-Lopez did not testify about this, and offers no evidence in

27.     From the time Gutierrez caught up with the Dodge sedan until he stopped it, he trailed the Dodge sedan by one or two car lengths.  <u>See</u> <u>id.</u> at 65:14-17 (Cairns, Gutierrez); <u>id.</u> at 95:18-96:17 (Pori, Gutierrez).

28.     Safe driving standards provide that drivers should follow no closer than one car length for every ten miles-per-hour at which they are traveling.  <u>See</u> <u>id.</u> at 96:18-97:12 (Pori, Gutierrez).

29.     The Dodge sedan was traveling approximately seventy-five miles-per-hour when Gutierrez was following dangerously close behind it.  <u>See</u> <u>id.</u> at 88:20-89:9 (Pori, Gutierrez); <u>id.</u> at 132:12-13 (Mechem).

30.     As he followed the Dodge sedan, Gutierrez ran a registration check, a stolen-vehicle check, and a seventy-two-hour-lane check on the vehicle to see of the Dodge sedan had crossed the border in the previous 72 hours.  <u>See</u> Gutierrez' Report at 2; Tr. at 66:6-11 (Cairns, Gutierrez); <u>id.</u> at 91:14-17 (Pori, Gutierrez).

31.     Gutierrez discovered that the Dodge sedan was not stolen, that it had not crossed the international border within the last seventy hours, and that it was registered to Misty and/or Edelberto Hernandez from Deming.  <u>See</u> Gutierrez' Report at 2; Tr. at 66:12-15 (Cairns, Gutierrez); <u>id.</u> at 91:23-93:2 (Pori, Gutierrez).

32.     Gutierrez' experience leads him to believe that Deming is a major staging area for illegal aliens entering the United States, and he was "a little suspicious" of the vehicle being registered to a Deming address.  <u>See</u> Gutierrez' Report at 2; Tr. at 66:21-67:2 (Cairns, Gutierrez); <u>id.</u> at 67:12-25 (Cairns, Gutierrez); <u>id.</u> at 93:8-10 (Pori, Gutierrez).

---

support of his contention, the Court credits Gutierrez' testimony.

33.     Gutierrez acknowledges that many areas in the southern part of New Mexico are major smuggling routes, but he is not suspicious of every vehicle originating from New Mexico's southern region.  See Tr. at 93:19-95:1 (Pori, Gutierrez).

34.     Gutierrez had "no information about recent apprehensions of aliens in the Truth or Consequences area," or recent illegal border crossings in the area.  Response at 7.  Accord Motion at 10; Tr. at 196:4-6 (Cairns).

35.     As Gutierrez followed the Dodge sedan, he passed Border Patrol Agent Thomas Owen Mechem, Jr., who, while on a roving patrol, was on the edge of an overpass above I-25 at mile marker 71.  See Tr. at 130:5-13 (Cairns, Mechem); id. at 131:1-13 (Cairns, Mechem).

36.     Mechem first overheard Gutierrez' radio traffic inquiring about the Dodge sedan and then observed Gutierrez following the Dodge sedan.  See id. at 130:13-18 (Cairns, Mechem); id. at 131:1-13 (Cairns, Mechem).

37.     Mechem entered the interstate, and followed behind Gutierrez.  See id. at 131:15-16 (Cairns, Mechem).

38.     With Gutierrez trailing two car lengths behind it, the Dodge sedan pulled into the fast lane to pass another vehicle on the road.  See id. at 64:1-65:13 (Cairns, Gutierrez); id. at 66:1-5 (Cairns, Gutierrez); id. at 100:2-7 (Pori, Gutierrez).

39.     When the Dodge sedan moved to the fast lane to pass the other vehicle, the rear of the Dodge sedan made a wide movement, which suggested to Gutierrez and Mechem that the driver did not have total control of the Dodge sedan because the driver was monitoring Gutierrez.  See id. at 132:9-18 (Cairns, Mechem).

40.     Once the Dodge sedan began to overtake the car it was passing, Gutierrez pulled into

the fast lane behind the Dodge sedan.  See id. 100:5-13 (Pori, Gutierrez).

41.     When Gutierrez pulled into the fast lane behind the Dodge sedan, the Dodge sedan finished passing the other vehicle, and then quickly changed lanes in front of the vehicle it had just passed, leading Gutierrez to believe the driver of the Dodge sedan was continuing to monitor him. See id. at 64:1-65:13 (Cairns, Gutierrez); id. at 66:1-5 (Cairns, Gutierrez).

42.     Under New Mexico law, drivers must yield to emergency vehicles.  See id. at 100:19-21 (Pori, Gutierrez).

43.     After Gutierrez and the Dodge sedan had both passed the other vehicle, Gutierrez again pulled in behind the Dodge sedan in the slow lane and continued to follow within one or two car lengths.  See id. at 102:20-103:1 (Pori, Gutierrez).

44.     Gutierrez activated his lights and sirens, and initiated a traffic stop to investigate the occupants of the Dodge sedan.  See id. at 70:21-23 (Cairns, Gutierrez); 132:19-22 (Cairns, Mechem).

45.     Gutierrez stopped the Dodge sedan at approximately mile marker 74 or 75, less than 100 air miles from the international border.  See Gutierrez' Report at 2; Tr. at 70:24-25 (Cairns, Gutierrez); id. at 132:19-133:3 (Cairns, Mechem); id. at 186:8-23 (Cairns, Mechem).[4]

_____

[4] In his report, Gutierrez states he stopped the Dodge sedan at mile marker 75, see Gutierrez' Report at 2, but at the hearing he testified that the report was inaccurate, and the stop occurred at mile marker 74, see Tr. at 70:24-25 (Cairns, Gutierrez); id. at 132:19-133:3 (Cairns, Mechem);  id. at 186:8-23 (Cairns, Mechem).  The difference is immaterial as both locations would be within 100 air-miles of the border.  Mile marker 75 falls approximately 92 air miles of the U.S.-Mexican border.  See http://www.gmap-pedometer.com (last visited November 17, 2010).  "We take judicial notice of this distance."  Citizens for Peace in Space v. City of Colorado Springs, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007)(citing Fed. R. Evid. 201(b), (c); Pearson v. United States, 150 F.2d 219, 221 (10th Cir. 1945); Nascone v. Spudnuts, Inc., 735 F.2d 763, 773 (3d Cir. 1984); http://www.gmap-pedometer.com).  See Fed. R. Evid. 201(b), (c)("A court may take judicial notice, whether requested or not," of a fact "not subject to reasonable dispute in that it is . . . capable of

46.     Gutierrez and Mechem approached the passenger side of the Dodge sedan.  See Gutierrez' Report at 2; Tr. at 71:6-8 (Cairns, Gutierrez); id. at 133:9-13 (Cairns, Mechem).

47.     Gutierrez asked both people inside the Dodge sedan about their citizenship.  See Gutierrez' Report at 2; Tr. at 71:6-18 (Cairns, Gutierrez); id. at 106:20-23 (Pori, Gutierrez); id. at 110:4-5 (Pori, Gutierrez).

48.     Both the driver, Juan Hernandez, and the passenger, Hernandez-Lopez, told Gutierrez that they were United States citizens, because they had been born in the United States.  See Gutierrez' Report at 2; Tr. at 72:1-4 (Cairns, Gutierrez); id. at 107:1-5 (Pori, Gutierrez); id. at 117:24-118:1 (Cairns, Gutierrez); id. at 134:20-21 (Cairns, Mechem).

49.     Both Hernandez and Hernandez-Lopez spoke English.  See Tr. at 72:5-14 (Cairns, Gutierrez); id. at 134:19-20 (Cairns, Mechem).

50.     Hernandez and Hernandez-Lopez acted nervous, both avoided eye contact, Hernandez mumbled his words, and Hernandez-Lopez gripped his seat and moved uncomfortably.  See Gutierrez' Report at 2; Tr. at 72:23-73:11 (Cairns, Gutierrez); id. at 123:20-23 (Cairns, Mechem).

51.     Gutierrez asked both Hernandez and Hernandez-Lopez about their travel plans.  See Gutierrez' Report at 2; Tr. at 73:12-14 (Cairns, Gutierrez); id. at 110:8-9 (Pori, Gutierrez); id. at 134:6-8 (Cairns, Mechem).

52.     Hernandez told Gutierrez that he was going to Albuquerque, New Mexico, to see his sick mother.  See Gutierrez' Report at 2; Tr. at 73:16-17 (Cairns, Gutierrez); id. at 110:12-16 (Pori,

---

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

Gutierrez).

53.     Hernandez also stated that he had encountered Hernandez-Lopez at a gas station a few hours earlier and that Hernandez-Lopez had asked Hernandez for a ride to Albuquerque.  See Gutierrez' Report at 2; Tr. at 110:17-20 (Pori, Gutierrez); id. at 135:15-17 (Cairns, Mechem).

54.     Hernandez-Lopez told Gutierrez that he was going to Albuquerque to party.  See Gutierrez' Report at 2; Tr. at 73:18-20 (Cairns, Gutierrez); id. at 110:12-16 (Pori, Gutierrez).[5]

55.     Gutierrez had not separated Hernandez and Hernandez-Lopez, so each heard the other's answer.  See Tr. at 111:1-14 (Pori, Gutierrez).

56.     The inconsistent travel objectives struck Gutierrez as odd, but he does not recall if he inquired further.  See Gutierrez' Report at 2; Tr. at 73:21-25 (Cairns, Gutierrez); id. at 110:24-111:1 (Pori, Gutierrez).

57.     Mechem received permission from Hernandez to search the trunk of the Dodge sedan, but found nothing in the trunk.  See Tr. at 134:15-135:5 (Cairns, Mechem).

58.     Gutierrez then asked Hernandez and Hernandez-Lopez for identification.  See Gutierrez' Report at 2; Tr. at 74:10 (Gutierrez); id. at 108:17-19 (Pori, Gutierrez); id. at 136:11-12 (Cairns, Mechem).

59.     Hernandez produced a New Mexico driver's license.  See Gutierrez' Report at 2; Tr. at 74:11-13 (Cairns, Gutierrez); id. at 108:22-23 (Pori, Gutierrez).

60.     Hernandez-Lopez had no identification.  See Gutierrez' Report at 2; Tr. at 74:11-17

---

[5] Mechem testified that both Hernandez and Hernandez-Lopez stated they were going to Albuquerque to party.  Because Gutierrez documented his conversation with the occupants of the vehicle, see Gutierrez' Report at 2, and Mechem testified that he may not have accurately recalled the conversation, see Tr. at 134:4 (Mechem); id. at 146:11-16 (Pori, Mechem), the Court credits Gutierrez' report and testimony over Mechem's testimony.

(Cairns, Gutierrez).

61.     Gutierrez found Hernandez-Lopez' lack of identification unusual and suspicious, because most United States citizens carry identification.  See Tr. at 75:15-22 (Cairns, Gutierrez).

62.     Gutierrez does not escort every passenger without identification to a Border Patrol station for further investigation.  See id. at 111:25-112:3 (Pori, Gutierrez).

63.     Hernandez-Lopez told Gutierrez that his name was Robert Lopez-Bautista and that his birth date was June 21, 1985.  See Gutierrez' Report at 2-3; Tr. at 74:17-22 (Cairns, Gutierrez); id. at 114:8-115:11 (Pori, Gutierrez).

64.     Gutierrez contacted his radio dispatcher out of the El Paso Sector and gave the dispatcher the biographical information that he had received from Hernandez and Hernandez-Lopez aka Lopez-Bautista, requesting immigration checks, warrants checks, and criminal history checks. See Gutierrez' Report at 3; Tr. at 75:25-76:4 (Cairns, Gutierrez).

65.     The information that Gutierrez received from the dispatcher indicated that Hernandez was a citizen of the United States of America.  See Gutierrez' Report at 3; Tr. at 137:4-5 (Cairns, Mechem); id. at 153:8-9 (Pori, Mechem).

66.     The dispatcher reported that neither Hernandez nor Hernandez-Lopez aka Lopez-Bautista had any outstanding warrants.  See Gutierrez' Report at 3; Tr. at 116:11-13 (Pori, Gutierrez).

67.     The database returned no information as to Hernandez-Lopez aka Lopez-Bautista. See Gutierrez' Report at 3; Tr. at 76:5-6 (Cairns, Gutierrez); id. at 137:10-11 (Cairns, Mechem); id. at 153:10-16 (Pori, Mechem).

68.     The dispatcher told Gutierrez that "it was possible" Hernandez-Lopez aka Lopez-

Bautista might have immigration documents.  Gutierrez' Report at 3.  <u>See</u> Tr. at 76:5-8 (Cairns, Gutierrez); <u>id.</u> at 113:17-114:7 (Pori, Gutierrez).

69.     If a person was a naturalized citizen, the dispatcher would report that the person has immigration documents.  <u>See</u> Tr. at 76:16-77:5 (Cairns, Gutierrez); <u>id.</u> at 78:24-79:2 (Pori, Gutierrez).

70.     If a person was a United States citizen born in the United States and had a passport, the dispatcher would report that the person has immigration documents.  <u>See</u> Tr. at 113:4-5 (Pori, Gutierrez).

71.     Mechem found this lack of information on Hernandez-Lopez aka Lopez-Bautista to be unusual, as Hernandez-Lopez had informed Gutierrez that he was a citizen of the United States and, as such, there would have likely been some information returned on him in response to Gutierrez' inquiry.  <u>See</u> Tr. at 137:10-14 (Cairns, Mechem).

72.     Mechem suspected that Hernandez-Lopez had given a false name, which indicated to Mechem that Hernandez-Lopez was illegally present in the United States or had arrest warrants pending for him.  <u>See</u> Tr. at 137:10-14 (Cairns, Mechem).

73.     Gutierrez decided to take both Hernandez and Hernandez-Lopez to the Truth or Consequences Border Patrol station for further investigation. <u>See</u> Gutierrez' Report at 3; Tr. at 117:3-6 (Pori, Gutierrez).

74.     Gutierrez told Hernandez and Hernandez-Lopez to come with him to the Truth or Consequences Border Patrol station so that he could collect Hernandez-Lopez' finger prints and confirm his identity.  <u>See</u> Gutierrez' Report at 3; Tr. at 77:6-13 (Cairns, Gutierrez); <u>id.</u> at 138:24-25 (Cairns, Mechem).

75.     Gutierrez directed Hernandez-Lopez to exit the Dodge sedan and enter his marked Border Patrol vehicle.  See Gutierrez' Report at 3.

76.     After exiting the Dodge sedan, Hernandez-Lopez admitted to Gutierrez that he was illegally present in the United States.  See Gutierrez' Report at 3; Tr. at 77:19-23 (Cairns, Gutierrez); id. at 138:24-25 (Cairns, Mechem).

77.     Gutierrez arrested Hernandez and Hernandez-Lopez, and transported them to the Truth or Consequences Border Patrol station for questioning.  See Gutierrez' Report at 3; Tr. at 77:24-78:6 (Cairns, Gutierrez).

78.     Based on Hernandez-Lopez' fingerprints, the IDENT/IAFIS system[6] identified him as Javier Hernandez-Lopez, a person who had previously committed crimes in the United States and who has been deported from the United States.  See Gutierrez' Report at 3; Tr. at 78:6-12 (Cairns, Gutierrez).

## PROCEDURAL BACKGROUND

On March 24, 2010, a grand jury returned an indictment charging Hernandez-Lopez with one count of re-entry of a removed alien, in violation of 8 U.S.C. §§ 1326(a) and (b).  See Doc. 11.  On April 28, 2010, Hernandez-Lopez filed his Motion to Suppress, seeking to suppress all of the evidence obtained by the Border Patrol following what he contends was his unlawful and excessive detention on February 13, 2010.  In particular, Hernandez-Lopez seeks to suppress incriminating statements about his nationality, his fingerprints, and the resulting match between his fingerprints and his immigration A-file and IAFIS information.  He argues that Gutierrez lacked reasonable

---

[6] The IDENT/IAFIS system is a computer database that matches identities with individuals based on the individual's fingerprints and biographical information.  See Response at 4.

suspicion to justify stopping the Dodge sedan in which he was riding as a passenger.  Hernandez-Lopez contends that the only "credible reason why Agent Gutierrez stopped the Dodge Sedan was because two, younger Mexican-American men were seated inside."  Motion at 9.  Hernandez-Lopez argues that the stop amounted to an "unlawful 'fishing expedition' by the Border Patrol Agent."  Id. at 9.  In the alternative, Hernandez-Lopez argues that, if Gutierrez had reasonable suspicion to make the initial stop, the resulting detention and search still violated the Fourth Amendment of the United States Constitution, because Gutierrez' investigative detention greatly exceeded the scope of the initial stop.  See Motion at 12.  Hernandez-Lopez further asserts that Gutierrez arrested him without probable cause when Gutierrez directed him to go with Gutierrez to the Truth or Consequences Border Patrol station.  See id. at 12.  Hernandez-Lopez moves the Court to suppress all of the information that law enforcement officers obtained following his detention and arrest on February 13, 2010.

On May 24, 2010, the United States filed the United States' Response to Defendant's Motion to Suppress Evidence.  See Doc. 29.  The United States argues that the stop and detention were justified.  The United States contends that, while the reasons Gutierrez gives for stopping the Dodge sedan do not establish reasonable suspicion individually, when taken together -- under the totality of the circumstances -- Gutierrez' justifications for suspecting Hernandez and Hernandez-Lopez of criminal activity amount to reasonable suspicion under the factors the Supreme Court of the United States established in United States v. Brignoni-Ponce, 422 U.S. 873 (1975).  The United States relies primarily on Hernandez' behavior to establish reasonable suspicion, in particular his being nervousness and his monitoring of Gutierrez.  The United States further contends that the scope of the stop did not exceed the basis for the stop.  On June 18, 2010, Hernandez-Lopez filed the

Defendant's Reply to the Government's Response to the Defendant's Motion to Suppress, reasserting that the stop and detention violated the Fourth Amendment.  See Doc. 33.  Hernandez-Lopez argues that the driver's nervousness and monitoring of Gutierrez are insufficient to establish reasonable suspicion.

At the August 13, 2010 evidentiary hearing, Hernandez-Lopez conceded that the United States need only prove reasonable suspicion of criminal activity to justify the stop, and not reasonable suspicion that the Dodge sedan was transporting illegal aliens.  See Tr. at 171:20-172:11 (Court, Pori).  The United States conceded that Gutierrez must have had reasonable suspicion of criminal activity that is within the jurisdiction of the Border Patrol.  See id. at 177:4-10 (Cairns); id. at 181:22-25 (Cairns).  The United States further conceded that the Border Patrol has no jurisdiction to enforce the New Mexico traffic code.  See Tr. at 177:20-21 (Cairns); id. at 181:25-182:4 (Cairns). In particular, the United States stated that the Border Patrol cannot "stop someone who is driving under the influence of alcohol or somebody who's driving recklessly."  Id. at 182:6-7 (Cairns).

At the hearing, the United States also conceded that, of the "observations that the officers made, none of them in and of themselves would rise to the level of reasonable suspicion," but argued that the observations establish reasonable suspicion under the totality of the circumstances.  Tr. at 192:5-11 (Cairns).  The United States conceded that Gutierrez had no evidence of recent border crossings.  See id. at 196:4-6 (Cairns).  The United States further conceded that nothing about the aspects of the Dodge sedan supported establishing reasonable suspicion of criminal activity.  See id. at 196:6-11 (Cairns).

## FOURTH-AMENDMENT LAW REGARDING REASONABLE SUSPICION

Consistent with the Fourth Amendment's prohibition against unreasonable searches and

-15-

seizures, Border Patrol agents on roving patrol are permitted "to stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the occupants are involved in criminal activity.  United States v. Cantu, 87 F.3d 1118, 1120 (10th Cir. 1996), cert. denied, 519 U.S. 906 (1996)(quoting United States v. Brignoni-Ponce, 422 U.S. at 884).  Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  United States v. Arvizu, 534 U.S. 266, 274 (2002).  Rather, "reasonable suspicion represents a 'minimum level of objective justification.'"  United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)(quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

A Border Patrol agent may stop a vehicle based on reasonable suspicion, without a warrant or probable cause to believe a crime is being committed, within "a reasonable distance" from the International Border.  8 U.S.C. § 1357(a)(3).  See United States v. Brignoni-Ponce, 422 U.S. at 877-78 (reconciling 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1(a)(2) with the Fourth Amendment).  Federal regulations define "reasonable distance" as, inter alia, 100 miles from the border.  8 C.F.R. § 287.1(a)(2).  See United States v. Barron-Cabrera, 119 F.3d 1454, 1458 n.4 (10th Cir. 1997).  When determining whether there is reasonable suspicion to stop a car a reasonable distance from the border, agents may consider any number of factors, including:

> (1) [The] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

United States v. Cheromiah, 455 F.3d 1216, 1220 (10th Cir. 2006)(quoting United States v. Monsisvais, 907 F.2d 987, 990 (10th Cir. 1990); citing United States v. Brignoni-Ponce, 422 U.S.

at 884-85).  "[T]he totality of the circumstances -- the whole picture -- must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-18 (1981).  "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."[7]  United States v. Brignoni-Ponce, 422 U.S. at 885.  Accord United States v. Cantu, 87 F.3d at 1121.  Courts gives due deference to a Border Patrol agent's judgment.  See United States v. De La Cruz-Tapia, 162 F.3d 1275, 1278 (10th Cir. 1998).

        "When evaluating an officer's decision to stop a vehicle, a court may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in isolation."  United States v. Cheromiah, 455 F.3d at 1220 (quoting United States v. Arvizu, 534 U.S. at 267; United States v. Gandara-Salinas, 327 F.3d 1130).  Factors that, by themselves, may be "consistent with innocent travel" may collectively amount to reasonable suspicion.  United States v. Arvizu, 534 U.S. at 274-75 (quoting United States v. Sokolow, 490 U.S. at 9).

_____

        [7] This principle seems to be at tension with the rule that an officer's "subjective characterization of his actions is irrelevant" when determining if reasonable suspicion existed. United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(citing United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)).  The Court understands the principles, however, to require it to consider whether a reasonable officer presented with the same circumstances as the actual officer faced, in light of that actual officer's experience, would have a "particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. at 417-18.  See United States v. Wilson, 96 F. App'x 640, 646 (10th Cir. 2004)("The evaluation of whether an officer has a 'particularized and objective basis for suspecting legal wrongdoing' is made 'from the perspective of the reasonable officer . . . .'"  (quoting United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003))).  See also United States v. Ceballos, 355 F. App'x at 229 (stating a court judges an officer's "conduct in light of common sense and ordinary human experience, and we accord deference to an officer's ability to distinguish between innocent and suspicious actions."  (citing United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001))(internal quotation marks omitted)).

1.      **Characteristics of the Area in Which the Vehicle Is Encountered**.

In United States v. Madroza-Acosta, 221 F. App'x 756 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit expressed skepticism of contentions that a place is a "source and destination point for illegal aliens" is a factor courts should consider in determining whether a state police officer had reasonable suspicion to stop van suspected of transporting illegal aliens. 221 F. App'x at 759 n.1. The Tenth Circuit stated that, "[t]o the extent that law enforcement officials seem primed to begin identifying 'known illegal alien communities' this type of evidence appears to be of minimal, if any, evidentiary value." 221 F. App'x at 759 n.1. See Reid v. Georgia, 448 U.S. 438, 441 (1980)(stating that conduct or circumstances that "describe a very large category of presumably innocent travelers" is insufficient to constitute reasonable suspicion).

2.      **The Proximity of the Area to the Border.**

"While the Supreme Court has cautioned that 'roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well,' proximity to the border may be considered as a factor in the reasonable suspicion calculus." United States v. Diaz-Juarez, 299 F.3d 1138, 1142 (9th Cir. 2002)(quoting Brignoni-Ponce, 422 U.S. at 882). The Tenth Circuit has stated that the significance of the proximity to the border declines the farther one travels from the border, and the Tenth Circuit provided guidance that stops within fifty miles contribute to establishing reasonable suspicion. See United States v. Mendez, 181 F. App'x 754, 757 (10th Cir. 2006)("Obviously, the closer the stop occurs to the border, the more weight we accord to this factor. . . .  A distance of fifty miles or less has routinely been held sufficiently close to the border to contribute to a finding of reasonable suspicion."). See Quintana-Garcia, 343 F.3d at 1272 (finding support from a proximity of fifty to sixty miles from the border); United States v.

Barron-Cabrera, 119 F.3d at 1458 n.4, 1460 (finding support from a proximity of forty-five miles from the border); United States v. Lopez-Martinez, 25 F.3d 1481, 1485 (10th Cir.1994)(finding support from a proximity of sixty miles from the border); United States v. Venzor-Castillo, 991 F.2d 634, 635, 639 (10th Cir. 1993)(holding an agent lacked reasonable suspicion to conduct a stop 235 miles from border).  The United States Court of Appeals for the Fifth Circuit uses a measure of fifty miles to limit the significance of the factor.  See United States v. Morales, 191 F.3d 602, 606 (5th Cir. 1999)("[T]he proximity of the stop to the border is the 'paramount factor' to consider; and . . . this factor 'is missing' if the stop is, as here, more than 50 miles from the border." (citation omitted)).

### 3.    The Driver's Behavior, Including Any Obvious Attempts to Evade Officers.

"The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."  United States v. Brignoni-Ponce, 442 U.S. at 884 (citing United States v. Larios-Montes, 500 F.2d 941 (9th Cir. 1974); Duprez v. United States, 435 F.2d 1276 (9th Cir. 1970)).  In United States v. Zambrano, 76 F. App'x 848 (10th Cir. 2003), the Tenth Circuit candidly acknowledged that a defendant's assertion "that 'reactive behavior' can be described so broadly as to be meaningless . . . .  ha[s] some resonance," stating:

> Indeed, the behavior descriptions sometime appear contradictory from case to case. An officer's suspicion is aroused: when a subject looks at him carefully or refuses to look at him; when a subject drives exactly at the speed limit or drives too slowly; when a subject appears too nervous or too nonchalant.  But we recognize the dynamic that well trained and experienced officers bring to the process, and hence, require that their suspicions be reasonable and articulable, not necessarily universal or profound.  And, we rely in large measure on the trial judge to separate the sincere from the contrived.

76 F. App'x at 851 n.3.

a.   **Reacting to Law Enforcement Officers**.

"[A] person's reaction to the presence of law enforcement officers can legitimately trigger suspicion."  United States v. Zambrano, 76 F. App'x at 850.  When occupants of the car "exhibit 'surprised or scared' facial expressions, widen their eyes, look back to watch the Border Patrol vehicle go by, return to looking straight forward with both hands gripping the steering wheel, look a second time, and then stare straight forward again," the Tenth Circuit has found such behavior to provide some support establishing reasonable suspicion.  United States v. Barron-Cabrera, 119 F.3d at 1457-58.  The Tenth Circuit has stated, however, that it takes "an uncomfortable stretch to believe [an] agent possessed 'a particularized and objective basis for suspecting legal wrongdoing'" based on an individual's "driving ten miles per hour below the posted speed limit[,] . . . .  appear[ing] nervous, looking at [an] agent's car several times in the rear view mirror, . . . gripping the steering wheel tightly" while a Border Patrol agent "follow[s] closely behind," and then failing to acknowledge an agent's vehicle as it passes.  United States v. Zambrano, 76 F. App'x at 851 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)(finding reasonable suspicion because, among others things, the vehicle had passed the border without being searched and the agent had intelligence that highway was being used by drug cartels because the Border Patrol checkpoint was closed for construction)).

The Fifth Circuit has asserted that "repeatedly looking into a rearview mirror is not suspicious conduct when it is the result of an officer's actions, for instance, if the patrol car is 'tailgating' the vehicle . . . ."  United States v. Vega, 254 F.3d 70, at *4 (5th Cir. 2001)(citing United States v. Jones, 149 F.3d 364, 370-71 (5th Cir.1998)).  In United States v. Jones, the Fifth Circuit asserted whatever support for establishing reasonable suspicion may come from a driver's swerving

because he is monitoring a Border Patrol agent following him is "destroyed" if an agent's conduct induces the driver's reactive behavior.  149 F.3d at 370.

The United States Court of Appeals for the Ninth Circuit has stated that "'[i]t is perfectly understandable that swerving within one's own lane of traffic would not support reasonable suspicion of smuggling, which has nothing to do with impairment,' but would support reasonable suspicion that the driver was impaired."  United States v. Palos-Marquez, 591 F.3d 1272, 1278 (9th Cir. 2010)(quoting Fernandez-Castillo, 324 F.3d 1114, 1120 (9th Cir. 2003)).

   **b.**  **Nervousness.**

"While a person's nervous behavior may be relevant,  we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials . . . ."  United States v. Barron-Cabrera, 119 F.3d at 1461 (quoting United States v. Peters, 10 F.3d 1517, 1521 (10th Cir. 1993)(quoting United States v. Hall, 978 F.2d 616, 621 n.4 (10th Cir. 1992))).  The Tenth Circuit has "held consistently that nervousness is 'of limited significance' in determining whether reasonable suspicion exists."  United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir. 2010)(quoting United States v. Williams, 271 F.3d at 1268 (quoting United States v. Wald, 216 F.3d 1222, 1227 (10th Cir. 2000))).  "Nervousness is of limited value in assessing reasonable suspicion for two reasons."  United States v. Simpson, 609 F.3d at 1147.  It is common for most citizens -- "whether innocent or guilty -- to exhibit signs of nervousness when confronted by a law enforcement officer."  United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997).  See United States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005)("[N]ervousness is a sufficiently common -- indeed natural -- reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative,

grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." (citation and internal quotation marks omitted)). Further, it is natural for a motorist to become more agitated as a stop is prolonged, and particularly when the officer seems skeptical or suspicious. See id. at 1128-29 ("For a motorist to become more nervous as the questioning becomes more prolonged and skeptical is not unnatural."). As the Tenth Circuit stated in United States v. Bloom, 975 F.2d 1447 (10th Cir. 1992): "Nothing in the record indicates whether [a Border Patrol agent] had any prior knowledge of Defendant, so we do not understand how [the agent] would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner. Rather, Defendant's appearance to [the agent] is nothing more than an inchoate suspicion or hunch." 975 F.2d 1447, 1458 (internal quotation marks omitted).

Extreme and persistent nervousness, however, "is entitled to somewhat more weight." United States v. West, 219 F.3d 1171, 1179 (10th Cir. 2000). See United States v. Williams, 271 F.3d at 1268. In United States v. Santos, the Tenth Circuit held that a defendant's "changing the topic from his travel plans to the weather, swallowing hard, licking his lips, which were quivering, and nervously stroking the top edge of the head liner of the patrol car with his hand" was insufficient to establish reasonable suspicion. 403 F.3d at 1127. The Tenth Circuit stated:

> In any event, we hold that the degree of nervousness found by the district court, while not inconsequential, is insufficient to be given much weight in the reasonable suspicion calculus. In undertaking this analysis, we bear in mind that the officer (and not the court) was present at the encounter, and the officer (and not the court) has the training and experience to evaluate and compare the reactions of motorists to questioning. We therefore give Trooper Peech's assessment the "due weight" to which it is entitled under the Supreme Court's precedents. Arvizu, 534 U.S. at 273-74, 122 S.Ct. 744; Ornelas [v. United States], 517 U.S. [690,] 699 [(1996)]. But neither Trooper Peech nor the district court described Mr. Santos's nervousness as extreme, extraordinary, or prolonged. According to Trooper Peech, Mr. Santos's hand shook visibly when handing over his license and registration early in the stop. Mr. Santos appeared to relax, however, during the first part of his interview in

Trooper Peech's car, only to become increasingly nervous as the interview increased in length and the officer questioned him more pointedly about his story. For a motorist to become more nervous as the questioning becomes more prolonged and skeptical is not unnatural. Such behavior falls short of the "extreme nervousness [that] did not dissipate throughout the entire stop" that led us to credit the finding of reasonable suspicion in Williams. 271 F.3d at 1269.

403 F.3d at 1128-29.

### c.   Driving Lawfully.

Careful, lawful driving gives little support to establishing reasonable suspicion. See United States v. Peters, 10 F.3d at 1522 ("[W]e fail to see the nexus between careful driving and illegal conduct."). "[P]assengers sinking down in an apparent effort to avoid detection . . . is suspicious conduct not clearly susceptible to unsuspicious interpretations, unlike passengers merely avoiding eye contact, turning their heads away from a light, or shielding their eyes." United States v. Barbee, 968 F.2d 1026, 1028 (10th Cir. 1992). "[C]autious driving of a rented moving truck, whose drivers are often inexperienced with the operation of large vehicles, cannot standing alone support a reasonable suspicion of illegal activity." 10 F.3d at 1522. A Border Patrol agent's assertion that a driver  was "was visibly nervous" based on the driver's "gripping the wheel tightly and looking straight ahead at the road" does not establish reasonable suspicion. 10 F.3d at 1522.

### FOURTH-AMENDMENT LAW REGARDING PROBABLE CAUSE

An arrest, "characterized by highly intrusive or lengthy search or detention," must be supported by probable cause. Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir.2000). See Tennessee v. Garner, 471 U.S. 1, 7 (1985). "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97

(10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001); citing

Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require

facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States

v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme

Court has made the following distinction between reasonable suspicion, which is sufficient for an

investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required

before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in
> the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but also
> in the sense that reasonable suspicion can arise from information that is less reliable
> than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89,

96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th

Cir. 2002).  Thus, the primary consideration is "whether a reasonable officer would have believed

that probable cause existed to arrest the defendant based on the information possessed by the

arresting officer."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(internal

quotation marks and alterations omitted).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's constitutional rights, the government

will be prohibited from using that evidence in a criminal prosecution of that person.  See United

States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.")(citations omitted).  In addition, a defendant may also suppress any other evidence deemed to be the "fruit of the poisonous tree," because it is evidence which was discovered as a direct result of the unlawful law enforcement activity.  United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  To suppress evidence that was derived following unlawful activity, the defendant must show that there is a factual nexus between the illegality and the challenged evidence.  See United States v. Olivares-Rangel, 458 F.3d at 1109; United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000).

For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

## ANALYSIS

Hernandez-Lopez argues that Gutierrez' stop of the Dodge sedan offended the Fourth Amendment because the agent lacked reasonable suspicion of criminal activity.  Hernandez-Lopez also argues in the alternative that the scope of the investigatory stop exceeded any reasonable suspicion Gutierrez may have had.  The United States responds that Gutierrez' stop of the Dodge sedan did not offend the Fourth Amendment, because it was based on reasonable suspicion that the Dodge sedan was transporting illegal aliens, and Gutierrez' detention of Hernandez-Lopez was

reasonable because Gutierrez' suspicion was not dispelled.  The Court concludes that, under the totality of the circumstances, Gutierrez did not have reasonable suspicion to justify stopping the Dodge sedan, and the Court will therefore suppress the evidence that came from the stop.

**I.     GUTIERREZ STOPPED THE DODGE SEDAN WITHIN 100 AIR-MILES OF THE BORDER.**

The parties dispute whether Gutierrez stopped the Dodge sedan in which Hernandez-Lopez was a passenger within 100 air-miles of the border.  A Border Patrol agent may stop a vehicle based on reasonable suspicion, without a warrant or probable cause to believe a crime is being committed, within "a reasonable distance" from the International Border.  8 U.S.C. § 1357(a)(3).  Federal regulations define "reasonable distance" as, among other things, 100 miles from the border. 8 C.F.R. § 287.1(a)(2).  See United States v. Barran-Cabrera, 119 F.3d at 1459 n.4.

The United States argues that the stop occurred within 100 air miles of the international border.  In his Motion, Hernandez-Lopez argues that the stop occurred slightly more than one hundred miles from the border.  See Motion at 9.  In his Reply, Hernandez-Lopez conceded that the stop occurred within 100 air miles from the border.  See Reply at 9.  At the hearing, however, Hernandez-Lopez stated that he did not concede the stop occurred with 100 air miles of the border. See Tr. at 210:11-13 (Pori).

Mile marker 75 falls approximately ninety-two air miles from the U.S.-Mexican border.  See http://www.gmap-pedometer.com (last visited November 17, 2010).  "We take judicial notice of this distance." Citizens for Peace in Space v. City of Colorado Springs, 477 F.3d at 1218 n.2 (citing Fed. R. Evid. 201(b), (c); Pearson v. United States, 150 F.2d 219, 221 (10th Cir. 1945); Nascone v. Spudnuts, Inc., 735 F.2d 763, 773 (3d Cir. 1984); http://www.gmap-pedometer.com)(taking judicial notice of distance).  See Fed. R. Evid. 201(b), (c)("A court may take judicial notice, whether

-26-

requested or not," of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

## II.   GUTIERREZ' STOP OF THE DODGE SEDAN WAS NOT BASED ON REASONABLE SUSPICION.

Gutierrez lacked reasonable suspicion to stop the Dodge sedan in which Hernandez-Lopez was a passenger.  Hernandez-Lopez argues that Gutierrez' stop of the Dodge sedan offended the Fourth Amendment, because Gutierrez had no objectively reasonable justification for stopping the Dodge sedan in which Hernandez-Lopez was riding as a passenger.  Hernandez-Lopez contends that Gutierrez had no credible, reliable information to justify a reasonable belief that the vehicle and its occupants were involved in any criminal activity, and that Gutierrez based his decision to stop the Dodge sedan on the ethnicity of its occupants.  The United States contends that Gutierrez' stop of the Dodge sedan was based on reasonable suspicion that the Dodge sedan was engaged in criminal activity.

Because he was on a roving patrol within 100 air miles of the border, Gutierrez must have had reasonable suspicion to stop the Dodge sedan, i.e., he must have been "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the occupants were involved in criminal activity.  United States v. Cantu, 87 F.3d at 1120 (quoting United States v. Brignoni-Ponce, 422 U.S. at 884).  Gutierrez is "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling."  United States v. Brignoni-Ponce, 422 U.S. at 885.  See United States v. Cantu, 87 F.3d at 1121.  The Court gives Gutierrez' judgment due deference.  See United States v. De La Cruz-Tapia, 162 F.3d 1275, 1278 (10th Cir. 1998).

Gutierrez may consider any number of factors in establishing reasonable suspicion to stop

the Dodge sedan, including:

> (1) [The] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

United States v. Cheromiah, 455 F.3d at 1220 (quoting United States v. Monsisvais, 907 F.2d at 990; citing United States v. Brignoni-Ponce, 422 U.S. at 884-85).  The Court must consider "the totality of the circumstances -- the whole picture" in determining whether Gutierrez had a "particularized and objective basis for suspecting the [Dodge sedan] of criminal activity."  United States v. Cortez, 449 U.S. at 417-18.  The Court must not, "[w]hen evaluating an officer's decision to stop a vehicle, . . . engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in isolation."  United States v. Cheromiah, 455 F.3d at 1220 (quoting United States v. Arvizu, 534 U.S. at 267; United States v. Gandara-Salinas, 327 F.3d 1130).  Factors that, by themselves, may be "consistent with innocent travel" may collectively amount to reasonable suspicion.  United States v. Arvizu, 534 U.S. at 274-75 (quoting United States v. Sokolow, 490 U.S. at 9).

## A.   THE CHARACTERISTICS OF THE AREA.

Hernandez-Lopez argues that "[t]here is nothing about the location of the stop which is entitled to deference in assessing Agent Gutierrez' reasonable suspicion."  Motion at 9.  Hernandez-Lopez asserts that I-25 is the main North/South highway for travel in the State of New Mexico.  The location of the stop is between the Albuquerque-Santa Fe region and the cities of Las Cruces and El Paso, in an area more than forty miles north of the I-25 fixed Border Patrol checkpoint.  The area where the stop took place is characterized by heavy commercial and leisure vehicle traffic, and

numerous traveler's services, including gas stations, restaurants, and stores.  Finally, Hernandez-Lopez contends, it is important to note that the stop occurred in an area where thousands of cars travel every day, and therefore that Hernandez-Lopez was traveling on a portion of northbound I-25 cannot provide reasonable suspicion for the stop.  See id. at 9-10.

While Hernandez-Lopez emphasizes the banal aspects of I-25, the United States points to its seedier side.  The United States contends that I-25 is a major corridor of travel for smugglers of contraband, illegal aliens, smugglers of illegal aliens, and that the interstate is the primary artery for illegal traffic bound from Juarez, Mexico, to parts north in the United States.  The United States concedes, however, "that the vast majority of people traveling on Interstate 25 are law-abiding citizens of the United States."  Response at 6.

In United States v. Madroza-Acosta, 221 F. App'x 756 (10th Cir. 2007), the Tenth Circuit expressed skepticism about an argument that a place is a "source and destination point for illegal aliens" was a factor that the court should consider in determining whether a state police officer had reasonable suspicion to stop a van suspected of transporting illegal aliens.  221 F. App'x at 759 n.1.  The Tenth Circuit stated that "[t]o the extent that law enforcement officials seem primed to begin identifying 'known illegal alien communities' this type of evidence appears to be of minimal, if any, evidentiary value."  221 F. App'x at 759 n.1.  The Tenth Circuit asserted that "[t]his is particularly true because so many geographical locations have been found to fall within the category of 'known drug source.'"  Id. (citations omitted).  Similarly, many roads in New Mexico have been found to be known corridors for smugglers and illegal aliens.  See, e.g., United States v. Holguin-Chavez, 279 F. App'x 668, 670 (10th Cir. 2008)(New Mexico State Highway 9); United States v. Rodriguez-Reyes, 214 F. App'x 809, 810 (10th Cir. 2007)(New Mexico State Highway 9); United

States v. Cheromiah, 455 F.3d at 1218 (I-10, I-25, New Mexico State Highway 26); United States v. Juarez-Torres, 441 F. Supp. 2d 1108, 1109 (10th Cir. 2006)(New Mexico State Highway 40); United States v. Mendez, 181 F. App'x 754, 757 (10th Cir. 2006)(New Mexico State Highway 8); United States v. Pacheco-Espinosa, 121 F. App'x 352, 353-54 (10th Cir. 2005)(New Mexico State Highway 171, New Mexico State Highway 181, New Mexico State Highway 195); United States v. Valenzuela, 365 F.3d at 897 (New Mexico State Highway 11, I-10); United States v. Quintana-Garcia, 343 F.3d at 1268 (New Mexico State Highway 26); United States v. Diaz-Borjas, 188 F.3d 519, at *1 (10th Cir. 1999)(I-10); United States v. Pena-Hernandez, 182 F.3d 934, at * 1 (10th Cir. 1998)(New Mexico State Highway 9); United States v. Barbee, 968 F.2d at 1029 (New Mexico State Highway 52); United States v. Gandara-Salinas, 327 F.3d at 1131 (U.S. Highway 54); United States v. Huereque-Mercado, 132 F.3d 43, at *1 (10th Cir. 1997)(New Mexico State Highway 11); United States v. Doyle, 129 F.3d 1372, 1374 (10th Cir. 1997)(New Mexico State Highway 11); United States v. Barron-Cabrera, 119 F.3d at 1460 (New Mexico State Highway 180).

Moreover, I-25 is a major artery for traffic in New Mexico -- the state's only north/south interstate. I-25 has two Border Patrol checkpoints for northbound traffic, one south and one north of where Gutierrez stopped the Dodge sedan, see Tr. at 141:16-25 (Cairns, Mechem), and the record provides no evidence whether either or both of the checkpoints were open or closed on the day of the stop; most likely one -- the one north of Las Cruces -- was open, and the one at Truth or Consequences closed. Because the United States concedes "that the vast majority of people traveling on Interstate 25 are law-abiding citizens of the United States," Response at 6, the Court concludes that driving on I-25 contributes some -- but not much -- to establishing a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States

v. Cortez, 449 U.S. 411, 417-18 (1981).  See Reid v. Georgia, 448 U.S. at 441 (stating that conduct or circumstances that "describe a very large category of presumably innocent travelers" is insufficient to constitute reasonable suspicion).  On the other hand, because the United States has checkpoints on I-25, and because it has a standing concern about traffic on that road, the Court does not believe that factor is zero.  In sum, alone the factor is not enough to establish reasonable suspicion, but with other factors, might contribute to the total considerations supporting a finding of reasonable suspicion.

### B.    THE CLOSE PROXIMITY OF THE AREA TO THE BORDER.

The United States argues that the stop occurred within 100 air miles of the border and that "[t]he close proximity to the border lessen the United States' burden in proving that the stop was based on a reasonable suspicion that the people inside the Dodge sedan were illegally present in the United States."  Response at 6 (citing United States v. Barran-Cabrera, 119 F.3d at 1462 (stating that a stop "reasonably near" the border is a relevant factor in the totality of the circumstances leading to an officer's reasonable suspicion)).

"While the Supreme Court has cautioned that 'roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well,' proximity to the border may be considered as a factor in the reasonable suspicion calculus."  United States v. Diaz-Juarez, 299 F.3d at 1142)(quoting Brignoni-Ponce, 422 U.S. at 882).  The Tenth Circuit has stated that the significance of the proximity to the border declines the farther one travels from the border, providing a rough guide of fifty miles as being sufficiently close to support establishing reasonable suspicion.  See United States v. Mendez, 181 F. App'x at 757 ("Obviously, the closer the stop occurs to the border, the more weight we accord to this factor. . . .  A distance of fifty miles

or less has routinely been held sufficiently close to the border to contribute to a finding of reasonable suspicion."); Quintana-Garcia, 343 F.3d at 1272 (finding support in a proximity of fifty to sixty miles from the border); United States v. Barron-Cabrera, 119 F.3d at 1458 n.4, 1460 (finding support in a proximity of forty-five miles from the border); United States v. Lopez-Martinez, 25 F.3d at 1485 (finding support in a proximity of sixty miles from the border); United States v. Venzor-Castillo, 991 F.2d at 635, 639 (holding agent lacked reasonable suspicion to conduct a stop 235 miles from border). The United States Court of Appeals for the Fifth Circuit uses a measure of fifty miles to limit the significance of the factor. See United States v. Morales, 191 F.3d at 606 ("[T]he proximity of the stop to the border is the 'paramount factor' to consider; and that this factor 'is missing' if the stop is, as here, more than 50 miles from the border." (citation omitted)).

In United States v. Fernandez-Castillo, the Tenth Circuit stated::

> When a person is traveling within our country, . . . we are more hesitant to allow interference [than at the border], even if the vehicle is close to the border. For this reason, this Court has repeatedly emphasized that one of the vital elements in the Brignoni-Ponce reasonable suspicion test is whether the agents had reason to believe that the vehicle in question recently crossed the border. When the stop occurs a substantial distance from the border, we have found this element missing.

991 F,2d at 638-39 (quoting United States v. Melendez-Gonzalez, 727 F.2d 407, 411 (5th Cir.1984)). The Tenth Circuit referenced Fifth Circuit precedent in explaining the relationship between the distance from the border and a Border Patrol agent's knowledge that a vehicle has crossed the border:

> The road upon which Melendez-Gonzalez was stopped passed through two towns, causing the Fifth Circuit to observe, "If a vehicle is already past towns in this country, the mere fact that it is proceeding on a public highway leading from the border is not sufficient cause to believe the vehicle came from the border." Additionally, we must be cognizant, as the Court was in Brignoni-Ponce, that "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well." The further one gets from the

border, the greater the likelihood the volume of legitimate travelers will increase. Thus, the more attenuated the international border becomes, the greater the significance distance assumes in the equation used to measure the power to stop only on reasonable suspicion when the officer has no knowledge whatever about the point of origin of a particular traveler's route.  Naturally, if the officer has an articulable basis for believing that point was across an international border, distance will have far less significance in judging the reasonableness of the officer's decision.

991 F.2d at 638-39 (citations omitted).

Gutierrez stopped the Dodge sedan approximately 92 air miles from the border.  This distance is almost twice the guideline that the Tenth Circuit and the Fifth Circuit have established.  United States v. Mendez, 181 F. App'x at 757 ("A distance of fifty miles or less has routinely been held sufficiently close to the border to contribute to a finding of reasonable suspicion."); United States v. Morales, 191 F.3d at 606("[T]he proximity of the stop to the border ... 'is missing' if the stop is, as here, more than 50 miles from the border." (citation omitted)).  Moreover, there is nothing in the record to indicate that the Dodge sedan had recently crossed the Border; on the contrary, a seventy-two hour lane check revealed that the vehicle had not recently crossed into the United States from Mexico.

Additionally, ninety-two air miles is on the threshold of the 100 air mile regulatory limit of the Border Patrol's authority to make warrantless stops.  See 8 C.F.R. § 287.1(a)(2).  If this factor contributes to establishing reasonable suspicion in this case, it will likely contribute to the reasonable-suspicion calculus in many cases.  The Court therefore finds weak, if any, support from this consideration.  It has similar force to the characteristics-of-the-area factor.  Because the United States has checkpoints in the area, the Court cannot say that the proximity to the border is of no significance, but the factor is weaker than stops made nearer the border.

### C.     THE USUAL PATTERNS OF TRAFFIC ON I-25.

Hernandez-Lopez argues that the Dodge sedan contained only two occupants and is a vehicle that is commonplace on that section of I-25.  The United States concedes that "the appearance of a Dodge sedan on Interstate 25 is consistent with the normal pattern of traffic on the interstate highway."  Response at 7.  The Court thus finds no support for establishing reasonable suspicion based on the usual patterns of traffic on I-25.

### D.     GUTIERREZ' EXPERIENCE.

Gutierrez has been a Border Patrol Agent for three years and has participated in arrests involving illegal aliens, including approximately twenty arrests on I-25.  See Tr. at 57:22-58:6 (Cairns, Gutierrez); id. at 93:11-14 (Pori, Gutierrez).  Gutierrez testified that he has made a number of arrests of illegal aliens in "vehicles [that] . . . have not had seventy-two hour lane checks, so they didn't cross the border 72 hours."  Tr. at 195:17-21 (Cairns).  While Gutierrez' experience may support not ruling out suspicions of a vehicle that has not crossed the border in seventy-two hours, to the extent that the United States argues a vehicle not having crossed the international border contributes to establishing reasonable suspicion, the Court rejects this argument.  First, the argument is contrary to Tenth Circuit caselaw.  See United States v. Fernandez-Castillo, 991 F.2d at 638-39 (quoting United States v. Melendez-Gonzalez, 727 F.2d at 411)("[T]his Court has repeatedly emphasized that one of the vital elements in the Brignoni-Ponce reasonable suspicion test is whether the agents had reason to believe that the vehicle in question recently crossed the border.").  Second, most of the vehicles in the United States likely have not recently crossed an international border, and the Court is unclear how a characteristic that is shared so broadly can support "a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. at 273.  See

-34-

Reid v. Georgia, 448 U.S. at 441 (stating that conduct or circumstances that "describe a very large category of presumably innocent travelers" is insufficient to constitute reasonable suspicion).

The Dodge sedan was registered to an address in Deming, and Gutierrez testified that Deming is a major staging area for illegal aliens entering the United States.  See Tr. at 66:21-67:2 (Cairns, Gutierrez); id. at 67:12-25 (Cairns, Gutierrez); id. at 93:8-10 (Pori, Gutierrez).  Gutierrez was a "little suspicious" of the Dodge sedan being registered to a Deming address.  Tr. at 93:8-10 ("[Pori:] [Y]ou thought that the vehicle being registered out of Deming was a little suspicious correct? [Gutierrez:] Yes, sir.").  But see id. at Tr. at 66:16-19 ("[Cairns:] [I]s the fact that a vehicle is registered in Deming, does that have any significance for you in your experience there at the T or C Border Patrol station? [Gutierrez:] Just that one significant reason, no.").  "To the extent that law enforcement officials seem primed to begin identifying 'known illegal alien communities' this type of evidence appears to be of minimal, if any, evidentiary value."  United States v. Madroza-Acosta, 221 F. App'x at 759 n.1.  Moreover, Gutierrez testified that many areas in the southern part of New Mexico are major smuggling routes, but that he is not suspicious of every vehicle originating from New Mexico's southern region.  See Tr. at 93:19-95:1 (Pori, Gutierrez).  The Court thus finds "minimal, if any," support for establishing reasonable suspicion in this factor alone.  United States v. Madroza-Acosta, 221 F. App'x at 759 n.1.

### E.    INFORMATION ABOUT RECENT ILLEGAL BORDER CROSSINGS IN THE AREA.

Hernandez-Lopez argues that Gutierrez had no information about recent illegal border crossings in the area.  The United States concedes that Gutierrez had "no information about recent apprehensions of aliens in the Truth or Consequences area" or recent illegal border crossings in the area.  Response at 7.  See Tr. at 196:4-6 ("I did not induce any evidence about recent border

crossings in the area so that factor number five is not applicable."). The Court, therefore, finds no support for this factor to establish reasonable suspicion.

### F.    ASPECTS OF THE VEHICLE.

Hernandez-Lopez argues that no aspects of the Dodge sedan were suspicious. The United States "concedes that a Dodge sedan is not the type of vehicle frequently used by smugglers, because of its size, [and] the size of its gas tank . . . ." Response at 8. The Dodge sedan had not crossed the border within the last seventy-two hours before the stop, it was not stolen, and it was registered. See Tr. at 66:12-15 (Cairns, Gutierrez); id. at 91:23-93:2 (Pori, Gutierrez). The Court thus does not find support for establishing reasonable suspicion in this factor.

### G.    THE APPEARANCE THAT THE VEHICLE IS HEAVILY LOADED.

Hernandez-Lopez contends that the Dodge sedan was not heavily loaded. The United States does not dispute Hernandez-Lopez' contention. Because the record does not provide any evidence the Dodge sedan was heavily loaded, such as that it was riding low to the ground, that its tires appeared under inflated, or that it reacted to bumps in the road by bouncing longer than other vehicles, the Court finds no support in this factor for establishing reasonable suspicion.

### H.    THE DRIVER'S BEHAVIOR.

The United States' argument that Gutierrez had reasonable suspicion to stop the Dodge sedan relies primarily on Hernandez' behavior while he was driving. See Response at 7 ("The driver's behavior is the most important factor in support of Agent Gutierrez' reasonable suspicion."); id. at 8 ("At bottom, the driver's reaction to the presence of the green-painted Border Patrol vehicle were [sic] strange and highly-unusual"). The occupants of the Dodge sedan failed to wave at Gutierrez, and they sat rigidly, looking forward at the road as they passed his marked Border Patrol vehicle.

See Gutierrez' Report at 2; Tr. at 60:22-61:17 (Cairns, Gutierrez); id. at 62:6-13 (Cairns, Gutierrez);

id. at 82:6-8 (Pori, Gutierrez); id. at 84:15-22 (Pori, Gutierrez); id. at 87:22-88:19 (Pori, Gutierrez).

"After observing the Border Patrol agent following him, the driver of the Dodge wavered on the

road, swerving between the lanes and crossing over the fog line.  The dodge [sic] sedan also

dramatically reduced its speed as though the driver wish[ed] the Border Patrol to pass."  Response

at 7.  The United States asserts that the driver's reaction to the marked Border Patrol vehicle was

suspicious, because drivers usually know that Border Patrol agents do not enforce the traffic laws,

and because swerving suggests the driver of the Dodge sedan was monitoring Gutierrez as Gutierrez

followed the vehicle.  See Response at 7; Gutierrez' Report at 2; Tr. at 61:9-17 (Cairns, Gutierrez);

id. at 82:6-8 (Pori, Gutierrez); id. at 84:15-22 (Pori, Gutierrez); id. at 87:22-19 (Pori, Gutierrez); id.

at 132:9-18 (Cairns, Mechem).  Hernandez-Lopez argues that the driver's behavior is nothing more

than a "characteristic response of the motoring public when closely followed by law enforcement

officers."  Reply at 11.

As the United States concedes, Gutierrez must have had reasonable suspicion of criminal

activity that is within the jurisdiction of the Border Patrol to justify stopping the Dodge sedan.[8]  See

---

        [8] On one level, this rule appears inconsistent with the rule that an officer's "subjective
characterization of his actions is irrelevant."  United States v. Ceballos, 355 F. App'x at 229 (citing
United States v. Winder, 557 F.3d at 1134).  It also appears at tension with the principle that an
officer need not suspect a specific crime.  United States v. Ceballos, 355 F. App'x at 227-28 (not
requiring an officer to identify the particular crime of which he or she had reasonable suspicion);
United States v. Romero, No. CR 09-1253 JB, 2010 WL 3829636 (D.N.M. Aug. 20,
2010)(Browning, J.).  See also United States v. Arvizu, 534 U.S. at 272 ("[T]he Fourth Amendment
is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity
'may be afoot.'" (quoting United States v. Sokolow, 490 U.S. at 7)).  But see Brignoni-Ponce, 422
U.S. at 884 ("[R]oving patrol may stop vehicles only if they are aware of specific articulable facts,
together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles
contain aliens who may be illegally in the country.").  If an officer's subjective intent is irrelevant
or if an officer need not have a specific crime in mind, it would, at first blush, seem irrelevant
whether the officer has jurisdiction to stop a suspect for a crime.  Nevertheless, the rule that an

---

United States v. Sealed Juvenile 1, 255 F.3d at 216 ("A law enforcement officer can make a warrantless arrest only if a federal or state law imbues him with that authority." (citing Atwater v. City of Lago Vista, 532 U.S. 318 (2001)(examining the original understanding of a peace officer's jurisdiction to determine if a statute was reasonable under the Fourth Amendment)); United States v. Rodriguez-Rivas, 151 F.3d 377, 381 (5th Cir. 1998)(holding that a Border Patrol agent lacked reasonable suspicion to stop a vehicle despite a traffic infraction); United States v. Barron-Cabrera, 119 F.3d at 1456 (finding that a defendant's traffic violations only "partially satisf[ied] the 'driver's behavior' prong of Brignoni-Ponce"); United States v. Venzor-Castillo, 991 F.2d at 638 (addressing "foundation upon which the Border Patrol's authority to stop is based"); United States v. Gonzales-Calderon, No. 05-CR-1369 BB, 2005 WL 6147579, at *3 n.1 (D.N.M. Sept. 16, 2005)(granting a defendant's motion to suppress, in part because "[t]he [Border Patrol agent]'s testimony that the van's speed was erratic and that the van made two lane changes is not relevant

---

officer cannot stop a person unless reasonable suspicion exists that the person committed or is committing a crime over which the officer has jurisdiction goes to a fundamental premise of the Fourth Amendment. A reasonable officer would not think he or she can stop a person over whom the officer knows he or she has no jurisdiction. See United States v. Wilson, 96 F. App'x at 646 ("The evaluation of whether an officer has a 'particularized and objective basis for suspecting legal wrongdoing' is made 'from the perspective of the reasonable officer . . . .'" (quoting United States v. Quintana-Garcia, 343 F.3d at 1270)). Whether measured by an objective or subjective standard, "[t]he concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer." United States v. Foster, 566 F. Supp. 1403, 1411-12 (D.D.C. 1983). See Akhil R. Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 801 (1994)("The core of the Fourth Amendment . . . is neither a warrant nor probable cause, but reasonableness."). "A warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause." Ross v. Neff, 905 F.2d 1349, 1354 (10th Cir. 1990). "A law enforcement officer can make a warrantless arrest only if a federal or state law imbues him with that authority." United States v. Sealed Juvenile 1, 255 F.3d 213, 216 (5th Cir. 2001)(citing Atwater v. City of Lago Vista, 532 U.S. 318 (2001)(examining the original understanding of a peace officer's jurisdiction to determine if a statute was reasonable under the Fourth Amendment)). A reasonable officer would not stop a vehicle based on suspicion of a crime over which the officer knew he or she had no jurisdiction.

-38-

[to determining whether reasonable suspicion existed] as the Agent admitted he had no authority to

stop the van for traffic violations"); Tr. at 177:4-10 (Cairns); id. at 181:22-25 (Cairns)("[T]he Border

Patrol . . . must have a reasonable suspicion of a crime over which it has jurisdiction and that would

be the smuggling of contraband whether it be human contraband or illegal narcotics."). Cf. Murillo

v. Musegades, 809 F. Supp. 487, 503-04 (W.D. Tex. 1992)("Enjoin[ing] the El Paso United States

Border Patrol Sector . . . from stopping, detaining, and questioning an individual [without reasonable

suspicion] that the individual is either illegally in the United States or is guilty of committing an

offense against the Immigration Laws of the United States for which the INS has jurisdiction.").

Arguing otherwise would "fail[] to recognize the foundation upon which the Border Patrol's

authority to stop is based."  United States v. Venzor-Castillo, 991 F.2d at 638 ("[T]he leeway of

employing reasonable suspicion instead of probable cause is based upon the hypothesis that the

person or object searched has come from outside the country."). See Jones ex rel. Murray v. Norton,

No. 2:09-cv-00730-TC-SA, 2010 WL 2990829, at*3 (10th Cir. July 26, 2010)("An arrest of a tribal

member on tribal land by a state officer is unconstitutional because '[a] warrantless arrest executed

outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable

cause.'" (quoting Ross v. Neff, 905 F.2d at 1354));  Ross v. Neff, 905 F.2d at 1353-54 ("We have

implied that an arrest made outside of the arresting officer's jurisdiction violates the Fourth

Amendment to the Constitution . . . .  We now so hold expressly.  A warrantless arrest executed

outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable

cause." (citing Smith v. City of Oklahoma City, 696 F.2d 784 (10th Cir. 1983))(other citations

omitted)); United States v. Simon, 368 F. Supp. 2d 73("[W]here an [Metro Transit Police] officer

makes an arrest outside his or her jurisdiction, the officer violates the arrested individual's Fourth

Amendment rights"); United States v. Foster, 566 F. Supp. at 1411-12 ("The concept of reasonableness embodied in the Fourth Amendment logically presupposes an exercise of lawful authority by a police officer.").   "As federal officers, Border Patrol agents are limited to their statutory powers." United States v. Juvenile Female, 566 F.3d 943, 948 (9th Cir. 2009)(citing Ortiz v. U.S. Border Patrol, 39 F. Supp. 2d 1321, 1326 (D.N.M. 1999)("Border Patrol agents are not general law enforcement officers. Instead, . . . their authority and duties are circumscribed by statute and limited in scope.").   The Border Patrol has no jurisdiction to enforce the New Mexico traffic code.   See 8 U.S.C. § 1357 (listing the powers of immigration officers and employees without warrant, and not listing powers to enforce traffic laws); 8 CFR § 287.8 (c)(2)(i)("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."); United States v. Rodriguez-Rivas, 151 F.3d at 381 ("Although the lack of required vehicle tags is a factor to consider in determining the reasonableness of the stop, we note that the absence of Texas license plates alone does not authorize a Border Patrol agent to stop a vehicle."); id. at 382 (Jones, J., dissenting)("[T]he majority simply state that Agent Garcia had no authority, as a Border Patrol agent, to stop the driver for that traffic violation.  This is correct but irrelevant . . . ."); United States v. Barron-Cabrera, 119 F.3d at 1456; Tr. at 177:20-21 (Cairns); id. at 181:25-182:4 (Cairns).[9]

---

[9] If the Border Patrol had jurisdiction to enforce the traffic laws, then Gutierrez' witnessing the Dodge sedan cross the fog line would likely have provided reasonable suspicion for him to stop the Dodge sedan.  See United States v. Winder, 557 F.3d at 1134 ("A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction."); United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ." (citation and internal quotation marks omitted)).  The Fifth Circuit has suggested that a Border Patrol agent may be authorized to stop a vehicle for traffic violations that rise to the level of breaching the peace.  In United States v. Sealed Juvenile 1, the Fifth Circuit affirmed a district court's denial of a motion to suppress evidence obtained by a United

A Border Patrol agent is not authorized to "stop someone who is driving under the influence of alcohol or somebody who is driving recklessly." Id. at 182:6-7 (Cairns). See United States v. Rodriguez-Rivas, 151 F.3d at 381; United States v. Gonzales-Calderon, 2005 WL 6147579, at *3 n.1. Rather, Gutierrez asserts, the Dodge sedan's driver's reactive behavior was suspicious because it showed he was nervous and that he was monitoring Gutierrez as Gutierrez followed him. See Response at 7; Gutierrez' Report at 2; Tr. at 61:9-17 (Cairns, Gutierrez); id. at 82:6-8 (Pori, Gutierrez); id. at 84:15-22 (Pori, Gutierrez); id. at 87:22-19 (Pori, Gutierrez); id. at 132:9-18 (Cairns,

_____

States Customs Service agent who stopped a vehicle for driving recklessly on the highway.  While driving an unmarked vehicle in civilian clothes, the off-duty agent observed a pickup truck driving erratically over the course of seven or eight minutes, during which the pickup truck "repeatedly cross[ed] the center stripe, veer[ed] back into the proper lane, and then dr[o]ve onto the emergency shoulder.  At one point, the pickup truck swerved entirely into the wrong lane and flashed its high-beam lights at an oncoming car." 255 F.3d at 215.  "Although Rivera's official duties as a Customs agent do not include the enforcement of traffic laws, he decided to stop the pickup truck for his own safety as well as that of other drivers on the highway." Id.  After stopping the pickup truck, the agent found 711 pounds of cocaine.  The defendant moved to suppress the evidence, arguing the agent's stop violated the Fourth Amendment. The Court initially granted the defendant's motion, but later reconsidered, reasoning that, "[w]hile Customs agents are not considered peace officers under Texas law, . . . they nevertheless have the right, under Texas' citizen's arrest statute, to stop anyone they see committing a felony or breaching the peace." Id. at 216.  The Fifth Circuit affirmed that the "a Customs agent retains the power of citizen's arrest, even when he acts in his capacity as a government agent." Id. at 218 (citing Tex. Code Crim. Proc. Ann. art. 14.01(a) (Vernon 1977)("A peace officer or any other person, may, without a warrant, arrest an offender where the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace."). The Fifth Circuit reasoned that, while "[t]raffic offenses per se do not qualify as a breach of the peace under Texas law," driving in the "wrong lane with her high beam lights flashing at an oncoming vehicle" "is egregious enough to threaten disaster and disorder or pose a potentially perilous public risk," and "constitutes a breach of the peace." Id. at 218 (citations omitted).

Here, the United States does not argue that the Dodge sedan's touching the fog line permitted Gutierrez' to make a citizen's arrest.  On the contrary, the United States "explicitly stated that [Gutierrez] stopped the truck not for any traffic violation, but exclusively '[t]o ascertain whether or not they were illegal aliens.'" United States v. Barron-Cabrera, 119 F.3d at 1456 (finding that a defendant's driving a "Ryder truck over both the shoulder line and the center line of Highway 180, indicating to Officer Garcia that Barron-Cabrera had become nervous" only "partially satisf[ied] the 'driver's behavior' prong of Brignoni-Ponce").

Mechem).

## 1. Failing to Wave While Rigidly Looking Ahead Provides Little, If Any, Support for Establishing Reasonable Suspicion.

Hernandez-Lopez argues that "avoiding eye contact is not suspicious behavior and that behavior which is consistent with lawful driving -- such as staring straight ahead and sitting upright -- simply does not give rise to a reasonable suspicion of criminal activity." Motion at 11 (citing United States v. Peters, 10 F.3d 1517; United States v. Barbee, 968 F.2d 1026). The United States argues that such behavior suggests the driver is nervous when the driver should have nothing to fear from the Border Patrol because of the Border Patrol's limited jurisdiction. See 8 U.S.C. § 1357; 8 CFR § 287.8 (c)(2)(i).

Careful, lawful driving alone does not support establishing reasonable suspicion. See United States v. Peters, 10 F.3d at 1522 ("[W]e fail to see the nexus between careful driving and illegal conduct."). "[P]assengers sinking down in an apparent effort to avoid detection . . . is suspicious conduct not clearly susceptible to unsuspicious interpretations, unlike passengers merely avoiding eye contact, turning their heads away from a light, or shielding their eyes." United States v. Barbee, 968 F.2d 1026, 1028 (10th Cir. 1992). See United States v. Peters, 10 F.3d at 1522 ("[C]autious driving of a rented moving truck, whose drivers are often inexperienced with the operation of large vehicles, cannot standing alone support a reasonable suspicion of illegal activity.").

The Tenth Circuit has "held consistently that nervousness is 'of limited significance' in determining whether reasonable suspicion exists." United States v. Simpson, 609 F.3d at 1147 (quoting United States v. Williams, 271 F.3d at 1268 (quoting United States v. Wald, 216 F.3d at 1227))). "Nervousness is of limited value in assessing reasonable suspicion for two reasons." United States v. Simpson, 609 F.3d at 1147. It is common for most citizens -- "whether innocent

or guilty -- to exhibit signs of nervousness when confronted by a law enforcement officer."  United States v. Wood, 106 F.3d at 948.  See United States v. Santos, 403 F.3d at 1127 ("[N]ervousness is a sufficiently common -- indeed natural -- reaction to confrontation with the police that unless it is unusually severe or persistent, or accompanied by other, more probative, grounds for reasonable suspicion, it is of limited significance in determining whether reasonable suspicion exists." (citation internal quotation marks omitted)).  As the Tenth Circuit stated in United States v. Bloom:

> Nothing in the record indicates whether [a Border Patrol agent] had any prior knowledge of Defendant, so we do not understand how [the agent] would know whether Defendant was acting nervous and excited or whether he was merely acting in his normal manner. Rather, Defendant's appearance to [the agent] is nothing more than an inchoate suspicion or hunch.

975 F.2d at 1458 (internal quotation marks omitted).

In United States v. Peters, the Tenth Circuit rejected finding reasonable suspicion based on "[t]he government's claim that Mr. Peters was visibly nervous . . . based on [Border Patrol] Agent Ochoa's stated observation that when he drove beside his van, Mr. Peters was gripping the wheel tightly and looking straight ahead at the road."  10 F.3d at 1522.  The Tenth Circuit stated:

> Again, we fail to see the nexus between careful driving and illegal conduct.  The only probative evidence of nervous conduct cited by the government is Mr. Ayinde's looking at Agent Ochoa out of the corner of his eye while facing forward.  In light of Agent Ochoa's knowledge that the defendants had already been stopped once that day and had been searched to no avail, Mr. Ayinde's sideways glances are simply insufficient to support a reasonable suspicion of illegal activities.  Such conduct is consistent with how a typical United States-born citizen might respond if, after already having been pulled over and searched earlier that day, a law enforcement official followed him in a marked car, pulled up alongside of his car, and then proceeded to stare at him intently.

10 F.3d at 1522.

Similarly, it is unclear what the nexus is between a driver's sitting upright, looking forward, and not removing his hand from the steering wheel to wave at law enforcement officers -- in

particular one who is intentionally concealing himself -- and illegal conduct.  "While a person's nervous behavior may be relevant,  we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials . . . ."  United States v. Barron-Cabrera, 119 F.3d at 1461 (quoting United States v. Peters, 10 F.3d at 1521 (quoting United States v. Hall, 978 F.2d at 621 n.4 (10th Cir. 1992))).  The berm from which Gutierrez observed traffic when the Dodge sedan passed him was hidden from approaching traffic, and drivers were unable to see the Border Patrol unit "until the last minute [when a driver would] see the Border Patrol agent sitting there when [the driver] c[a]me around the corner."  Tr. at 129:3-4 (Mechem).  The Court's wariness of "claims that a Defendant was nervous or exhibited nervous behavior after being confronted" is heightened when the confrontation is designed to surprise.  United States v. Hall, 978 F.2d at 621 n.4.

### 2.    A Driver's Monitoring of a Law Enforcement Official Following Dangerously Close Does Not Establish Reasonable Suspicion.

The United States argues that it was suspicious that the Dodge sedan swerved as Gutierrez followed it, because that suggested to Gutierrez that the driver was monitoring Gutierrez.  A driver's reaction to a Border Patrol agent can support establishing reasonable suspicion.  See United States v. Barron-Cabrera, 119 F.3d at 1461.  "However, when the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed."  United States v. Jones, 149 F.3d at 370-71 (5th Cir. 1998).  The Ninth Circuit, however, has stated: "'It is perfectly understandable that swerving within one's own lane of traffic would not support reasonable suspicion of smuggling, which has nothing to do with impairment,' but would support reasonable suspicion that the driver was impaired."  United States  v. Palos-Marquez, 591 F.3d at 1278 (quoting United States v.

Fernandez-Castillo, 324 F.3d at 1120).

In United States v. Barron-Cabrera, the Tenth Circuit affirmed the district court's holding that a Border Patrol agent had reasonable suspicion to stop a truck based, in part, on the driver's reaction to being followed by a Border Patrol agent, including the truck's swerving. "While the Border Patrol vehicle 'tailed' the Ryder truck at close distance for about two miles, the Ryder truck slowed down from about 58 mph to about 45 mph (the speed limit was 55 mph)." 119 F.3d at 1456. The Border Patrol agent "also testified that, while tailing the Ryder Truck, he observed it touch both the shoulder of the road and the center line." Id. The Tenth Circuit held that these facts "at least partially demonstrated" the driver's-behavior factor under United States v. Brignoni-Ponce. 119 F.3d at 1461. The Tenth Circuit elaborated:

> The district court credited both Officer Garcia's account of Barron-Cabrera's body language upon catching sight of the Border Patrol vehicle, and Officer Garcia's testimony that similar body language was often exhibited by smugglers in similar situations. Further, Barron-Cabrera tapped his brakes when Officer Garcia turned around and began tailing him, something that the district court thought "adds a little bit to the Government's case; not much." Finally, after noticing that Officer Garcia had made a U-turn to follow him, Barron-Cabrera drove the Ryder truck over both the shoulder line and the center line of Highway 180, indicating to Officer Garcia that Barron-Cabrera had become nervous. In our view, these facts partially satisfy the "driver's behavior" prong of Brignoni-Ponce.

119 F.3d at 1461.

As Gutierrez caught up with the Dodge sedan and positioned himself behind the Dodge sedan, it wavered on the road, swerving between the lanes and crossing over the fog line. See Gutierrez' Report at 2; Tr. at 63:10-17 (Cairns, Gutierrez); id. at 104:5-11 (Pori, Gutierrez); id. at 131:24-132-5 (Cairns, Mechem). When Gutierrez first caught up with the Dodge sedan, it was in the right lane, and Gutierrez was in the left passing lane. See id. at 97:13-99:21 (Pori, Gutierrez). Gutierrez came within a car length of the Dodge sedan, at which time it reduced its speed as though

the driver wished the Border Patrol agent to pass.  See Gutierrez' Report at 2; Tr. at 65:20-25 (Cairns, Gutierrez); id. at 97:13-99:21 (Pori, Gutierrez).  Gutierrez decelerated in the fast lane until the Dodge sedan was ahead of him, and then he changed lanes to fall in behind the Dodge sedan in the slow lane.  See id. 99:6-23 (Pori, Gutierrez).  Gutierrez reasonably found some support for being suspicious from the Dodge sedan's swerving and slowing in the right lane as an emergency vehicle approached and seemed to be passing him in the passing lane.  The Court concludes "these facts partially satisfy the 'driver's behavior' prong of Brignoni-Ponce."  United States v. Barron-Cabrera, 119 F.3d at 1461.

After Gutierrez caught up with the Dodge sedan, he trailed dangerously close behind it. Gutierrez trailed the Dodge sedan by one or two car lengths.  See Tr. at 65:14-17 (Cairns, Gutierrez); id. at 95:18-96:17 (Pori, Gutierrez).  Safe driving standards provide that drivers should follow no closer than one car length for every ten miles-per-hour at which they are traveling.  See Tr. at 96:18-97:12 (Pori, Gutierrez).  The Dodge sedan was traveling approximately seventy-five miles-per-hour when Gutierrez was following it.  See id. at 88:20-89:9 (Pori, Gutierrez); id. at 132:12-13 (Mechem). While Gutierrez followed dangerously close behind, the Dodge sedan swerved, and returned quickly to the slow lane after passing another vehicle.  Gutierrez found this behavior suspicious, because it suggested the driver was monitoring Gutierrez.

The Fifth Circuit has asserted that "repeatedly looking into a rearview mirror is not suspicious conduct when it is the result of an officer's actions, for instance, if the patrol car is 'tailgating' the vehicle . . . ."  United States v. Vega, 254 F.3d 70, at *4 (citing United States v. Jones, 149 F.3d at 370-71).  In United States v. Jones, the Fifth Circuit asserted whatever support for establishing reasonable suspicion may come from a driver's swerving because he is monitoring

a Border Patrol agent following him is "destroyed" if the agent's conduct induces the driver's

reactive behavior.  149 F.3d at 370.  The Fifth Circuit stated:

> The behavior of a driver may support a reasonable suspicion.  Therefore, if the driver of a vehicle appears nervous at being followed or is so preoccupied by the presence of law enforcement as to allow his vehicle to drift off the road or across the center line, his behavior may reinforce the law enforcement officer's suspicion.  However, when the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed.  In this case, the fact that Jones continually glanced back at Agent Barrera in his rear-view mirror and subsequently drifted off the road-way does not give rise to reasonable suspicion.  It was far more likely that Jones kept looking at Agent Barrera in his rear-view mirror because Agent Barrera was tailgating Jones, and Jones drifted off the pavement because he was looking in his rear-view mirror instead of where he was going.  It should have occurred to Agent Barrera that Jones's behavior was the natural, innocent-man's response to being tailgated and not so much the apprehension of the guilty at being caught.

149 F.3d at 370-71 (citations omitted).

Similarly, whatever support may be found in Hernandez' driving when Gutierrez followed

him dangerously close in a marked emergency vehicle with a light bar for four miles was

"destroyed."  149 F.3d at 370.  Cf. United States v. Peters, 10 F.3d at 1522 ("[Nervous] conduct is

consistent with how a typical United States-born citizen might respond if, after already having been

pulled over and searched earlier that day, a law enforcement official followed him in a marked car,

pulled up alongside of his car, and then proceeded to stare at him intently.").  Consequently, the

Court gives no weight to Hernandez' swerving or pulling quickly in front of another vehicle after

passing it while Gutierrez followed dangerously close behind.

## I.     THE TOTALITY OF THE CIRCUMSTANCES.

Hernandez-Lopez contends that a full consideration of all of the reasons Gutierrez offers for

stopping the Dodge sedan evinces that Gutierrez had no specific and articulable facts which could

justify the stop and the resulting detention.  At best, Hernandez-Lopez argues, Gutierrez had nothing

more than "inchoate suspicions and unparticularized hunches" whether the men in the car were engaged in illegal activity, and that these suspicions and hunches were insufficient to provide reasonable suspicion. Motion at 12 (citing United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998)). The United States "concedes that while the location in which the stop occurred is both relevant to the standard upon which this Court reviews the agent's action and relevant to this Court's review of the agent's actions, that the actions of the driver of the Dodge sedan are the most important factors to the analysis." Response at 8. "At bottom," the United States argues, "the driver's reaction to the presence of the green-painted Border Patrol vehicle were strange and highly-unusual." Id. at 8. The United States further concedes that, of the "observations that the officers made, none of them in and of themselves would rise to the level of reasonable suspicion," but argues that the observations establish reasonable suspicion under the totality of the circumstances. Tr. at 192:5-11 (Cairns).

The Supreme Court has cautioned that, "because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multifaceted, 'one determination will seldom be useful precedent for another.'" Ornelas v. United States, 517 U.S. at 698 (quoting Illinois v. Gates, 462 U.S. 213, 238 n.11 (1983)). Accord United States v. Lopez-Martinez, 25 F.3d at 1484 ("[O]ur roving 'border patrol stop cases are fact driven and must be considered on a case-to-case basis'"") (quoting United States v. Martin, 15 F.3d 943, 950 (10th Cir. 1994), aff'd on reh'g in part, 18 F.3d 1515 (10th Cir. 1994), cert. denied, 513 U.S. 868 (1994)). The Court must consider "the totality of the circumstances -- the whole picture" in determining whether Gutierrez had a "particularized and objective basis for suspecting the [Dodge sedan] of criminal activity." United States v. Cortez, 449 U.S. at 417-18.

There is no "minimum number of factors necessary to constitute reasonable suspicion or any outcome determinative criteria." United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir.1994). The Court must not, "[w]hen evaluating an officer's decision to stop a vehicle, . . . engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in isolation." United States v. Cheromiah, 455 F.3d at 1220 (quoting United States v. Arvizu, 534 U.S. at 267; United States v. Gandara-Salinas, 327 F.3d 1130). Factors that, by themselves, may be "consistent with innocent travel" may collectively amount to reasonable suspicion. United States v. Arvizu, 534 U.S. at 274-75 (quoting United States v. Sokolow, 490 U.S. at 9).

Looking at the whole picture -- the totality of the circumstances -- the Court does not find that United States has established that Gutierrez had "a particularized and objective basis for suspecting the [occupants of the Dodge sedan] of criminal activity." United States v. Cortez, 449 U.S. at  417-18.  Taken in combination, as the Court must, the Court concludes that the circumstances do not establish reasonable suspicion.  The factors each merit little or no weight individually, and added together they are insufficient to justify Gutierrez' stopping the Dodge sedan. The United States relies primarily on the driver's reactive behavior, but the Court concludes "these facts partially satisfy the 'driver's behavior' prong of Brignoni-Ponce."  United States v. Barron-Cabrera, 119 F.3d at 1461.

Other than the driver's behavior, the facts on which Gutierrez founded his suspicion of the Dodge sedan -- that it was driving on I-25 100 air miles from the border -- "describe a very large category of presumably innocent travelers."  Reid v. Georgia, 448 U.S. at 441.  In Reid v. Georgia, the Supreme Court considered whether a DEA agent had established reasonable suspicion of wrongdoing because

(1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a
principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner
arrived in the early morning, when law enforcement activity is diminished, (3) he and
his companion appeared to the agent to be trying to conceal the fact that they were
traveling together, and (4) they apparently had no luggage other than their shoulder
bags.

448 U.S. at 440-41.  The Supreme Court "concluded that the agent could not as a matter of law, have

reasonably suspected the petitioner of criminal activity on the basis of these observed

circumstances."  448 U.S. at 441. The Supreme Court stated that only the attempt to conceal the fact

that they were traveling together related to the individuals' "particular conduct.  The other

circumstances describe a very large category of presumably innocent travelers, who would be

subject to virtually random seizures were the Court to conclude that as little foundation as there was

in this case could justify a seizure."  448 U.S. at 441.  Similarly, the only facts on which Gutierrez

relied that were particular to the Dodge sedan were the driver's apparent nervousness upon coming

suddenly upon a law enforcement vehicle was intentionally concealed, and then monitoring the law

enforcement vehicle as it pursued him and followed dangerously close behind him.

The Court finds support for its decision that Gutierrez lacked reasonable suspicion in both

Tenth Circuit cases finding reasonable suspicion and those finding no reasonable suspicion.  Where

the Tenth Circuit has found reasonable suspicion existed for a Border Patrol agent to stop a vehicle

based in part on a driver's reactive behavior, the Tenth Circuit has always found additional facts

specific to the vehicle that supported establishing reasonable suspicion.  In United States v.

Zambrano, the Tenth Circuit affirmed a district court's decision that a Border Patrol agent had

reasonable suspicion to stop a vehicle approximately seventy miles from the border under the United

States v. Arvizu factors.  The agent relied in part on the driver's reactive behavior.  The agent passed

the driver going the opposite direction, and the agent contended the driver "looked 'very carefully'

at the agent's vehicle." 76 F. App'x at 850.  The Tenth Circuit agreed with the district court that this

look was "not enough to justify a traffic stop." Id. at 850.  After turning around and catching up with

the driver, the agent "proceeded to follow closely behind and noticed several things indicative of a

driver who was aware of the presence of law enforcement":

> The agent testified that Mr. Zambrano was driving ten miles per hour below the
> posted speed limit.  He appeared nervous, looking at the agent's car several times in
> the rear view mirror, and when the agent moved into oncoming traffic to pass the
> Mercury, Mr. Zambrano did not turn to look, but appeared to be gripping the steering
> wheel tightly.  After passing Mr. Zambrano's car, it became apparent to the agent that
> the Mercury was slowly drifting farther behind.  The agent pulled to the side of the
> road, stopped, waited for Mr. Zambrano to pass in front of him, and then initiated the
> investigatory stop.

Id. at 850-51.  The Tenth Circuit stated that it was "an uncomfortable stretch to believe the agent

possessed 'a particularized and objective basis for suspecting legal wrongdoing' based only on Mr.

Zambrano's behavior."  Id. at 850-51 (quoting United States v. Arvizu, 534 U.S. at 273).  The Tenth

Circuit found, however, other facts supported finding the agent had reasonable suspicion to stop the

vehicle.  While following the vehicle, the agent learned the vehicle had crossed the border an hour

and a half earlier without being searched.  See id. at 851.  Additionally, the agent stopped the vehicle

on New Mexico Highway 54, which the agent had current intelligence was being used by drug

cartels because the Border Patrol station was closed for construction.  See id. at 851.  Evaluating the

totality of the circumstances, the Tenth Circuit held the agent had a reasonable and articulable

suspicion to believe the defendant was engaged in illegal activity:

> The agent['s] specific observations, while marginal, must be considered in
> combination with environmental factors. The cumulative impact of disparate facts
> viewed from a global perspective permit Agent Collier to have reasonably inferred
> that Mr. Zambrano had just entered the United States from Mexico, had not been
> subject to search at the border, and had chosen to travel on this particular highway --
> known as a corridor for drug smuggling -- in an attempt to circumvent the closed
> checkpoint.

See id. at 851.  Unlike the agent in United States v. Zambrano, Gutierrez asks the Court to make the "uncomfortable stretch to believe the agent possessed 'a particularized and objective basis for suspecting legal wrongdoing' based only on [Hernandez'] behavior," despite that the Dodge sedan had not crossed the border, Gutierrez possessed no specific intelligence about smuggling operations, the record did not indicate that the Border Patrol stations on I-25 were not open, and the Dodge sedan was farther from the border, on the margin of the 100 air-mile zone.  The United States asks the Court to stretch too far.

In United States v. Barron Cabreram, the Tenth Circuit found the totality of the circumstances supported finding reasonable suspicion to make a stop, in part because the defendant "drove in a stiff manner which Officer Garcia had observed other smugglers assume when tailed by a law enforcement vehicle."  119 F.3d at 1462.  The Tenth Circuit, however, also relied on numerous other factors:

> In sum, the "totality of the circumstances" in the present case amount to this: Barron-Cabrera and a companion were driving: (1) a Ryder truck unaccompanied by another vehicle towed or driving in tandem; (2) on Highway 180, a lightly traveled road rarely used for household moves; (3) which was reasonably near the Mexican border; (4) which was a known smuggling corridor which bypassed every permanent border checkpoint in the vicinity; and (5) upon which four vehicles carrying 32 aliens had already been apprehended within the same month.  When Barron-Cabrera spotted a Border Patrol vehicle, (6) he became noticeably agitated; (7) he tapped on his brakes and slowed to nearly ten miles per hour below the speed limit; (8) he drove over the center line and the shoulder line; and (9) he drove in a stiff manner which Officer Garcia had observed other smugglers assume when tailed by a law enforcement vehicle.  In our opinion, these factors, considered as a whole, establish sufficient reasonable suspicion to support Officer Garcia's traffic stop.

119 F.3d at 1462.  As in United States v. Zambrano, the Tenth Circuit found the Border Patrol agents had reasonable suspicion to stop the vehicle based on more than a nervous driver almost 100 miles from the border.

On the other hand, the Tenth Circuit has found that suspicious reactive behavior on a known smuggling route near where Gutierrez stopped the Dodge sedan is insufficient to establish reasonable suspicion.  In United States v. Miranda-Enriquez, 941 F.2d 1081 (10th Cir. 1991), the Tenth Circuit addressed similar circumstances to those before the Court, where a driver reacted to a Border Patrol agent in a manner that the agent construed to be suspicious:

> The testimony of Agent Johnston established the following facts which we have previously summarized: Mr. Miranda-Enriquez was driving northwest on New Mexico Highway 52 near Truth or Consequences, which is 98 miles from the Mexican border, at 9:00 p.m. on February 15, 1989, in a 1984 Datsun Nissan Sentra. The Sentra displayed Arizona license plates and its rear windows and license plate were covered with dust.  Agent Johnston was working at the Border Patrol checkpoint on I-25.  There is a dirt road connecting with Highway 52 used by numerous vehicles containing smugglers to avoid the Las Cruces border patrol units, and which contains dust similar to that found on Mr. Miranda-Enriquez's car. Highway 52 also is traveled extensively by tourists visiting a nearby lake.  There are dirt roads around the lake, and the dust on Mr. Miranda-Enriquez's car was of the same type as found on some of these dirt roads.  It is not unusual to see people driving from the lake with dust on their cars.

> After Mr. Miranda-Enriquez tripped the sensor located on Highway 52, Agent Johnston drove to the intersection of Highway 85 and Highway 52 and parked so that his headlights could shine perpendicularly toward the stop sign on Highway 52.  Mr. Miranda-Enriquez stopped at the intersection, did not turn his head, and proceeded south onto Highway 85.  It is possible to survey the intersection for oncoming cars prior to stopping at this intersection, although it was Agent Johnston's opinion that "when you get up to the stop sign, you have to look."  Agent Johnston has worked at this checkpoint for 11 years, and has made two or three hundred arrests on Highway 52.  At 3:00 a.m., the chances are "probably" fifty-fifty that a car traveling on Highway 52 will contain a smuggler, although Agent Johnston did not know what the likelihood would be that a car would contain a smuggler at 9:00 p.m. Agent Johnston would have stopped Mr. Miranda-Enriquez even if his car had displayed New Mexico license plates, or if there had been no dust on his car.

> There was no testimony that Agent Johnston had received word that there had been recent illegal border crossings in the area, nor was there testimony that Agent Johnston thought that the Sentra contained concealed compartments or that it appeared to be heavily loaded.

941 F.2d at 1083-84 (citations omitted).  The Tenth Circuit held that the Border Patrol agent did not

have reasonable suspicion to make the stop, because it found the facts were similar to United States

v. Monsisvais, where the Tenth Circuit found the Border Patrol failed to show "a basis for

concluding that a vehicle's presence on Highway 85 at 7:30 p.m. is at all unusual, much less that it

is suggestive of criminal conduct." United States v. Miranda-Enriquez, 941 F.2d at 1084.(quoting

United States v. Monsisvais, 907 F.2d at 990-91).  The Tenth Circuit found "that it is not unusual

to encounter dust covered vehicles coming from the lake on Highway 25," and

> attach[ed] little significance to the fact that Mr. Miranda-Enriquez did not turn his
> head at the intersection because it was possible to see oncoming cars before he
> reached the stop sign.  Indeed, as for staring into headlights of a parked car at an
> intersection, it seems prudent for a driver's safety that it be avoided.

941 F.2d at 1084.  Similarly, the Court places little significance on the reactive behavior of the

driver of the Dodge sedan, leaving only the environmental factors of driving on Interstate 25 almost

100 miles from the border, which is not "at all unusual, much less that it is suggestive of criminal

conduct."  United States v. Miranda-Enriquez, 941 F.2d at 1084 (quoting United States v.

Monsisvais, 907 F.2d at 990-91).

In sum, Gutierrez based his reasonable suspicion on Hernandez and Hernandez-Lopez

traveling in a Dodge sedan: (i) registered to a Deming address; (ii) on I-25, the main north-south

artery in New Mexico, where the vast majority of vehicles are law abiding; (iii) on the margin of

being reasonably close to the border, almost twice the Tenth Circuit's fifty-mile guideline.  Upon

spotting Gutierrez' marked border patrol unit which had a light bar, which was hidden from

approaching traffic so that drivers would not see it until the last minute, (iv) Hernandez and

Hernandez-Lopez failed to wave and were stiff; (v) when Gutierrez caught up with the Dodge sedan,

the Dodge sedan wavered, suggesting the occupants noticed the Border Patrol vehicle following it;

and (vi) the driver of the Dodge sedan monitored Gutierrez as he followed dangerously close for

four miles.  The Dodge sedan is not a vehicle that smugglers typically use, it was not overloaded, it had no hidden compartment, it was typical of the traffic on I-25, it had not crossed the border in seventy-two hours, it was registered, and it was not stolen.  Gutierrez had no reports of recent illegal border crossings or recent apprehensions of illegal aliens in the Truth or Consequences area, and the record does not indicate the Border Patrol checkpoints on I-25 were not operating.  The United States concedes that half of the Brignoni-Ponce factors do not support finding reasonable suspicion. The Court concludes that what factors upon which the United States relies offer little support.  The United States acknowledges that none of Gutierrez' observations alone establish reasonable suspicion, and that it relies primarily on the driver's behavior, but the Court concludes that even that factor is only "partially satisf[ied]."  United States v. Barron-Cabrera, 119 F.3d at 1461.  Looking at the totality of the circumstances, therefore, the Court concludes that the circumstances fall short of establishing reasonable suspicion for Gutierrez to have stopped the Dodge sedan, because Gutierrez did not have "specific articulable facts, together with rational inferences from those facts, that reasonably warrant[ed] suspicion" that the occupants of the Dodge sedan were involved in criminal activity.  United States v. Cantu, 87 F.3d at 1120 (quoting United States v. Brignoni-Ponce, 422 U.S. at 884).

## III.   THE EVIDENCE THAT CAME FROM THE ILLEGAL STOP MUST BE SUPPRESSED.

In his Motion to Suppress, Hernandez-Lopez argues that all of the evidence in this case was obtained only after an unlawful stop and an excessive detention when Agent Gutierrez resolved to make a custodial arrest which lacked probable cause solely in an effort to obtain "biometric information" of Hernandez-Lopez' identity. Consequently, Mr. Hernandez-Lopez' seeks to suppress all evidence that came from Gutierrez' stop of the Dodge sedan on February 13, 2010, including

Hernandez-Lopez' fingerprints, identifying information, and immigration A-file as the fruit of the illegal seizure.

For the exclusionary rule to apply, Hernandez-Lopez must show, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once Hernandez-Lopez makes this showing, if the United States still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.  See id.

The Court holds that Hernandez-Lopez has shown, by a preponderance of the evidence, that Gutierrez did not have reasonable suspicion to stop the Dodge sedan.  There also appears to be a causal nexus between the unjustified stop and the evidence that Hernandez-Lopez seeks to exclude. The United States does not argue that an exception to the exclusionary rule applies and does not appear to contest that, if the stop was not constitutionally justified, the Court must suppress the evidence of Hernandez-Lopez' identity.  The Court, therefore, grants Hernandez-Lopez' request to suppress the evidence that came from the February 13, 2010 stop.

**IT IS ORDERED** that the Defendant's Motion to Suppress, filed April 28, 2010 (Doc. 21), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
    United States Attorney
Norman Cairns
    Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Brian A. Pori
    Assistant Federal Public Defender
Albuquerque, New Mexico

    *Attorney for the Defendant*